Charles J. Bour, Plaintiff in Error, v. Illinois Central Railroad Company, Defendant in Error.

Gen. No. 17,332.

1. APPEALS AND ERRORS—*academic question will not be determined.* Where, after hearing on motion to dissolve on the face of the bill, a judge by an oral decision dissolves a temporary injunction and dismisses the bill, no relief but an injunction being sought, the question whether on the expiration of the term of the judge a succeeding judge could enter the order *nunc pro tunc* is academic.

2. JUDGMENTS—*entry after expiration of term of judge.* Where a judge by an oral decision dissolves a temporary injunction and dismisses the bill, on a motion before a succeeding judge to enter the order *nunc pro tunc*, after the expiration of the term of the judge, the minutes of the former judge are the best evidence to establish the fact that a judgment was rendered.

3. EQUITY—*relief from breach of contract.* Where the damages for a breach of contract are incomputable even approximately,

they are irreparable and equity will interfere, and where with the difficulty of computation there is joined insolvency, and perhaps where the insolvency without the uncertainty exists, equity may decree relief to prevent a failure of justice.

4. INJUNCTIONS—*difficulty in computing damage for breach of contract.* On a breach of contract the mere difficulty of computation of damages as distinguished from the impossibility of such computation, the difficulty being unmingled with some other element making legal relief inadequate, will not warrant the use of an injunctive process to enforce the keeping of the contract.

5. INJUNCTIONS—*when adequate remedy at law for breach of contract.* Where a railroad company wrongfully terminates a contract granting to a person for a certain period the sole and exclusive right to place advertisements in its passenger cars, damages from the loss of future profits that would "doubtless" amount to a certain sum, from liability on unexpired advertising contracts, from liability to pay commissions to agents obtaining contracts, and from the removal or rendering useless of the fixtures in the cars, are susceptible of proof in an action at law, and the termination of the contract will not be enjoined.

6. INJUNCTIONS—*negative covenant not to engage in advertising business.* Where a railroad company wrongfully terminates a contract granting for a certain period a sole and exclusive right to place advertisements in its passenger cars, the negative covenant implied in the grant will not be enforced by enjoining the company from allowing advertising except as placed by complainant in its cars.

Error to the Superior Court of Cook county; the HON. WILLIAM FENIMORE COOPER, Judge, presiding. Heard in this court at the March term, 1911. Affirmed. Opinion filed December 30, 1912.

**Statement by the Court.** The plaintiff in error in this case, the complainant below, filed his verified bill in the Superior Court of Cook County, August 10, 1911, making the following allegations:

January 1, 1909, the Illinois Central Railroad, as party of the first part, executed a written memorandum of contract with Charles J. Bour as party of the second part, whereby the railroad in consideration of covenants and payments therein named, purported to grant to Bour, for a period of five years from January 1, 1909, "the sole and exclusive right to place advertisements in each and every of the suburban passenger

cars, so called, of the party of the first part that now or hereafter may be used in its suburban trains running between Chicago and Flossmoor, between Chicago and South Chicago, between Chicago and Blue Island, and between Chicago and Addison and intermediate stations.''

Further provisions of this contract are that the railroad will, so far as it legally can, carry Bour and employees not to exceed five in number when engaged in this advertising business and advertising material in reasonable quantities, free of charge. Bour agrees that he will pay at the office of the treasurer of the railroad:

''In payments to be made monthly on this 15th day of each and every month during the continuance of this agreement (the first payment to be made February 15, 1909) fifty per cent. (50%) of the gross amount received by him from advertisements placed in the said suburban cars; provided that the amount paid for any month during the continuance of this agreement shall not be less than one thousand dollars ($1,000), whether or not the said sum of one thousand dollars shall be less or more than fifty per cent. (50%) of the gross amount received by the party of the second part from the advertising business in the said suburban cars; that quarterly, that is, in the months of April, July, October and January in each year settlements shall be made for the preceding three months, and at the time of such settlements the party of the second part will immediately pay over to the party of the first part such amount as fifty per cent (50%) of his gross receipts from the said advertising business for the preceding three months shall exceed the amount of the monthly payments of one thousand dollars each herein provided to be paid. Provided, however, that in the event it should be ascertained that fifty per cent of the total amount of the gross receipts from the said advertising business should be less than the said one thousand dollars per month, the party of the second part shall not be entitled to any refund or rebate, it being expressly agreed that in no event shall the revenue of

the party of the first part under this agreement be less than one thousand dollars per month.''

Books of account are to be kept by Bour, subject to the inspection of officials of the railroad. The persons, property and material carried under the contract are to be so carried at the risk of the second party.

''All advertisements and the size, form, style and location thereof shall at all times be subject to the supervision and approval of the President of the party of the first part or such other officer as it may select, and any advertisements of an objectionable character after being placed in any of such passenger cars shall at once be removed by the party of the second part if such President or such other officer shall so request. The advertisements so to be placed in said cars shall be attached thereto under the directions and supervision of the superintendent of machinery of the party of the first part or such other officer as it may select.''

On the expiration of the right granted by the contract, whether at the end of the five years ''or upon any sooner termination thereof, as hereinafter provided,'' the party of the first part shall remove all his advertising matter and leave the cars in their former condition.

''The party of the second part shall not assign or transfer this agreement nor sublet any rights under it, without the written consent of the party of the first part. Any privilege so sublet by the party of the second part shall be sublet in such manner as to yield to the party of the first part no less than fifty per cent of the gross amount derived therefrom by the party to whom such privilege may be sublet.''

*      *      *      *      *      *      *      *      *

''It is further mutually understood and agreed by and between the parties hereto, that if either party hereto shall fail to keep and perform all and singular the several agreements herein contained and every part thereof, or to make any payment herein provided to be made, then the other party may terminate this agreement by giving thirty days' notice in writing of its or his intention so to terminate the same, and the

said agreement and the rights hereinabove granted at the time mentioned in said notice shall cease, anything herein to the contrary notwithstanding, and upon the determination of this agreement, or at the end of the period first above mentioned, if the party of the second part shall neglect or refuse to remove immediately all advertisements, advertising devices and materials from the said cars, the same may be removed at once by the party of the first part at the expense of the party of the second part.''

This contract was the renewal of contracts previously entered into between the Railroad Company and Bour. The first of said contracts, which were all substantially identical with the one in question except as to dates and amounts, ran from January 1, 1889, to December 31, 1893; the second from January 1, 1894, to December 31, 1898; the third from January 1, 1899, to December 31, 1903; the fourth from January 1, 1904, to December 31, 1908. These were followed by the one first above described. Under these prior four contracts Bour had paid to the Illinois Central Railroad Company $224,296 ''as rental for advertising spaces occupied by him in said suburban passenger cars.''

From January 1, 1909, to the time of filing the bill Bour carried on the business of advertising in the cars of the Railroad Company under the contract of January 1, 1909, and during that time paid to the Railroad Company ''as the rental for the said spaces he has occupied in said cars under said contract'' the sum of $21,939.91 for the period from January 1, 1909, to July 1, 1910, and for the month of July, 1910, he owed or would owe said company under said contract the sum of $1,000 or more.

For the purposes of said advertising business it was necessary for Bour to hire, and he did hire, offices in Chicago, and he laid out $5,000 in purchasing materials and equipments, etc., for the successful conduct of said business.

There are about 175 of said suburban passenger cars

in service and about fifty spaces for advertisements in each of said cars, aggregating about 8,750 spaces for advertisements, all of which at the time of filing the bill were taken or occupied by the advertisements of various persons, and Bour had paid divers persons about $3,000 in soliciting the various advertisements displayed in said cars. All the various persons whose advertisements are thus in the cars have contracts with Bour which stipulate the amount they agree to pay Bour therefor, and the length of time Bour agrees to keep the advertisements in said cars. The time thus specified varies from a few months to one or more years. Many of said contracts would not expire until a year or more after the date of filing the bill.

Bour during all the 21½ years preceding the filing of the bill created said business of advertising in the said suburban cars and built up the same from nothing so that the receipts therefrom amount to more than $30,000 yearly. Said Railroad Company received no revenue whatever from said source prior to January 1, 1889. Since that time it has received from Bour under said contracts about $246,235.97, and the receipts are increasing every year. Bour's net monthly receipts from said business after paying the railroad and all expenses are from $1,000 to $1,250 per month, and he believes that during the remainder of the period covered by his contract they will be much more.

In building up and developing the business Bour has necessarily expended large amounts of time, energy, labor and money, and has created for himself a standing reputation and good will among the advertising public of great value to himself.

Bour has at all times and in every respect faithfully performed all the terms of the existing contract, and the Railroad Company has frequently expressed itself as satisfied with the manner in which he has conducted the business and never indicated anything to the contrary, but notwithstanding, "without any right, justification or provocation whatever" it "on to-wit,

June 13, 1910, notified" Bour "that it had determined
to terminate and that by said notice it did terminate
said contract on and after thirty days from the date of
receipt of said notice by him, to-wit, thirty days from
and after said thirteenth day of June, A. D. 1910,"
and stated to Bour that it had "fully decided and de-
termined to at once cancel and terminate or to wholly
ignore and disregard said contract" of January 1,
1909, and to hereafter conduct said advertising busi-
ness itself or to have it done by some person other
than Bour from and after the thirteenth of July, 1910,
and would not thereafter permit Bour to act under
said contract.

The bill further represents that if the contract in
question should be thus terminated, the complainant
Bour would lose the money he had invested and paid
out in the business and the profits he might otherwise
make for the three years and a half following, and
become liable in damages to parties who had contracts
with him for advertising space in the cars; that he
was surprised at the notice of termination given him
and called on the vice-president of the company, who
signed the notice, and expressed his surprise; that the
said vice president did not deny that the complainant
had always done all that he had agreed to do by the
terms of the contract; that the complainant protested
that the company had no right to ignore or attempt
to cancel or terminate said contract, and that there-
after there was discussion of the matter at several in-
terviews between complainant and the said vice presi-
dent, in which the complainant was led to believe that
the company would abandon its determination to can-
cel, terminate or ignore said contract, but on the ninth
day of August, 1910, the complainant was finally and
definitely notified that it would, after that date, ignore
said contract as before set forth, and would thereafter
itself conduct the advertising business in said subur-
ban passenger cars, or cause or permit the same to be

carried on by parties other than the complainant, either by contract with such parties or otherwise.

The bill contains prayers for injunctions *pendente lite* and permanent restraining the Railroad Company from cancelling or terminating or attempting to cancel or terminate said contract of January 1, 1909, or from ignoring, violating or disregarding said contract or attempting to do so, and from removing or attempting to remove from said suburban passenger cars any of the complainant's property or equipments used in said advertising business, and from attempting to prevent the complainant from enjoying all the rights, benefits and profits granted to him by the contract, and "from itself carrying on or attempting to carry on said advertising business or using said advertising spaces so leased" to the complainant in said suburban cars, and from employing or contracting with any party or parties other than the complainant to carry on said advertising business or permitting any such party or parties to place advertisements in said suburban cars during the unexpired term of said contract of January 1, 1909.

As an argument therefor the bill contains this paragraph:

"Your orator further represents that unless this Honorable Court grants its writ of injunction as hereinafter prayed, your orator will sustain very great pecuniary loss and damages, for which an action at law can afford him no adequate remedy; that while his monthly net profits from said advertising business during the next three years and five months (that being the remaining and unexpired period covered by said existing contract) will doubtless amount to between twelve and fifteen hundred dollars, it would be impossible for a court of law to justly and accurately measure and determine the amount of such probable future profits and consequent damages to your orator if he is deprived thereof by said Railroad Company as it threatens and intends to do as aforesaid, and the same is true of the damages he will or may have to pay to

divers parties with whom he has contracts as aforesaid for placing their advertisements in said cars for various unexpired periods, and the same is also true as to commissions your orator has paid and is legally liable to pay for the obtaining of the various and numerous unexpired advertising contracts he now has; neither could a court of law correctly or justly estimate your orator's damages if said Company appropriates or bears out and removes from its said cars as it threatens to do your orator's said fixtures and equipments in said cars contained, which will be of no value if removed from said cars, and will be rendered useless for advertising purposes or for any other purpose, and your orator avers that in these and various other ways he will suffer and sustain great and irreparable damage and injury if said Illinois Central Railroad Company is not restrained as hereinafter prayed for.''

On this bill and an affidavit of the complainant in support thereof an injunction until the further order of the court as prayed was issued on August 10, 1910, without notice.

August 17, 1910, the Railroad Company entered its appearance in said cause, and gave notice of a motion to dissolve the injunction. August 23rd, on leave given by the court to do so, without prejudice to the injunction, the complainant amended his bill by adding allegations:

That it had been for years the custom of railroad companies operating a suburban service about Chicago to permit advertisements to be displayed in its cars, and that street railroads did the same without having broader powers than the defendant Railroad Company; that such a custom was general in the United States; that passengers in the suburban trains of the defendant desired the information afforded by such advertisements, and that "such advertisements in the said cars of the defendant are not only a source of revenue to the defendant enabling it more ade-

quately to perform its duty as a common carrier without increasing its charge for the transportation of goods and passengers, but also are a source of information and interest to the passengers upon the suburban cars of said defendant Railway Company, and tend to add to the convenience and information and to satisfy the curiosity and interests of such passengers.''

Also: That the defendant company on August 5, 1910, by circular letter notified various persons with whom the complainant had entered into contracts for advertising, that the contract of the Railroad Company with the complainant had been canceled, and asked the direct patronage of the said advertisers, wherefore the complainant believes and charges the fact to be that the defendant is attempting wrongfully to appropriate to its own use and advantage the work done and the benefit of the moneys expended by the complainant in working up said advertising business.

August 23 and 24, 1910, the motion to dissolve the injunction was argued by counsel for the respective parties before Judge Chetlain in the superior court. Briefs were also filed with him. He took the case under advisement.

On December 3, 1910, Judge Chetlain, whose term of office was about to expire, in open court announced his conclusion in the said cause, that the injunction should be dissolved. The complainant by his solicitor was represented in the court room at the time. The defendant was not.

It appears from the record filed in this court on this writ of error, that there is a difference in the recollection of the judge and minute clerk on the one hand, and of the complainant on the other, of what thereafter occurred at said session of the court; but on January 16, 1911, a motion made by the defendant was heard before Judge Cooper in said superior court (Judge Chetlain's term having expired) that the clerk of said court should be ordered to spread of record

*nunc pro tunc* an order alleged to have been made by Judge Chetlain on December 3, 1910. On the hearing of said motion Judge Cooper found that Judge Chetlain on said December 3d rendered a decision on said motion for the dissolution of said injunction, and that by oral decision he rendered dissolved said injunction and made and entered his decision in the minute book used by him as judge of the court. Judge Cooper thereupon entered the following order:

"On motion of the solicitor for defendant the Clerk of this Court is hereby ordered upon the hearing of the evidence and the inspection of the minutes of Judge Chetlain in said cause to enter of record as of date of December 3, 1910, the following order.

"*The injunction heretofore entered in this case is dissolved.*"

On January 21, 1911, there was presented to Judge Cooper a draft of a proposed order that as of the court's own motion there should be added to the *nunc pro tunc* order above described the words "Bill dismissed for want of jurisdiction. Appeal prayed and allowed," which request the court denied.

On January 25, 1911, Judge Cooper on motion of defendant's solicitors entered a decree reciting that the cause had theretofore been considered upon the bill of complaint and on the motion of defendant to dissolve the temporary injunction theretofore issued for want of equity appearing on the face of the bill; that said motion to dissolve the injunction had been allowed, and that no relief other than an injunction had been prayed by said bill, and ordering that the bill be dismissed.

To reverse this decree and the order dissolving the injunction the present writ of error has been prosecuted, the plaintiff in error assigning for error not only the dissolution of the injunction and the dismissal of the complainant's bill, but in various forms of words attacking the actions of Judge Cooper in hearing evidence as to the proceedings of Judge Chetlain on De-

cember 3, 1911, in considering the minutes of Judge Chetlain as to said proceedings, and in ordering an entry of the order dissolving the injunction *nunc pro tunc* as of December 3, 1910.

WEST & ECKHART, for plaintiff in error.

JOHN G. DRENNAN, for defendant in error; WALTER S. HORTON and BLEWETT LEE, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

This cause has been argued before us very elaborately both orally and in printed briefs. A wealth of authority has been cited on both sides of the controversy, the nature of which is fully shown by the detailed statement which we have prefixed to this opinion.

We have considered all of the points made by counsel and the citations by which they support them, but we do not think that a discussion of them all, or even of most of them, would be useful.

Thus, the question as to the propriety of Judge Cooper's action in entering the order dissolving the injunction *nunc pro tunc,* following it by an order dismissing the bill, is to our mind academic.

The cause was fully heard by the superior court on a motion to dissolve on the face of the bill the temporary injunction granted without notice. The motion, which set forth specific reasons for its allowance, was equivalent to a general and special demurrer to the bill. No relief but an injunction was asked. The superior court, after hearing, found and announced its decision on the questions involved and entered an order dissolving the injunction. Following this, it dismissed the bill, which was the proper and logical sequence of the dissolution of the injunction. The question before us, we conceive, is not whether the same judge of the superior court entered the order who

heard the argument on and first announced his decision on the motion, nor whether the judge who dismissed the bill should have entered the order dissolving the injunction *nunc pro tunc* or as on the actual date of its entry; but whether the order dismissing the bill was justifiable.

This in another form is merely the single question of the sufficiency of the case shown by the face of the bill to warrant the issuance of an injunction. If that was sufficient, the injunction should not have been dissolved nor the bill dismissed. If it was not sufficient, the action of the superior court was proper in both the dissolution and dismissal, irrespective of whether the testimony of Judge Chetlain and his minute clerk and the evidence of Judge Chetlain's own minutes (the best possible evidence by which to make an amendment of the record.   Howell v. Morlan, 78 Ill. 162; Grand Pacific Hotel Co. v. Pinkerton, 118 Ill. App. 89), were sufficient in themselves to warrant Judge Cooper's action in entering the order of dissolution *nunc pro tunc*.

Nor do we think that a discussion of the position of the defendant company that its contract with the complainant was *ultra vires* and void, would be more useful.

If we were prepared to accede to it, it would indeed involve the disposition of the cause before us. We are not so prepared, however, and as the view that we take of the cause leads to an affirmance of the action of the court below in dismissing the bill, anything that we might say in negativing this particular contention of the defendant would necessarily be merely *obiter dictum*. If the defense is valid, and the Railroad Company was not at liberty, under its corporate powers, to advertise in its cars, or if it were, was not at liberty to delegate to another for compensation the power it had itself, that defense remains to be made, if it becomes necessary and desirable, before another tribunal, on which our views on a question which we did not decide in this cause would not be binding.

For the purposes of this case, therefore, we shall assume, as contended by the plaintiff in error, that the contract of January 1, 1909, was a valid and binding contract, and that under its terms the defendant was wholly without right or justification in breaking it.

The further contention of the plaintiff in error, however, that he is entitled to a remedy in equity by injunction, we cannot sustain. It is based primarily on the theory that the remedy at law by a suit for damages for a breach of this contract would not be adequate.

To establish this it is urged that the damages at law could not be accurately computed, or, by the usual rules of evidence, ascertained with reasonable certainty.

It is upon our opinion on this contention that we rest our judgment.

First, it is to be noted that mere difficulty in computing damages is not a ground for the interference of equity. As Mr. Justice Miller, speaking for the Supreme Court of the United States, said in Texas & P. R. Co. v. Marshall, 136 U. S. 393 (in which the computation of damages for the breach of the contract sued for was indubitably far more difficult than in the case at bar, and in which, nevertheless, the plaintiff was relegated to its action at law):

"Though there may not be any rule by which these damages can be estimated with precision, this is not a conclusive objection against a resort to a court of law, for it is very well known that in all judicial proceedings for injuries inflicted by one party on another, whether arising out of tort or out of contract, the relief given by way of damages is never the exact sum which compensates for the injury done, but with all the rules which have been adopted for the measurement of damages, the relief is only approximately perfect."

Our own supreme court has said in Carlson v. Koerner, 226 Ill. 15 (p. 21):

"To show that damages are merely speculative is not sufficient to give a court of equity jurisdiction. They may be approximated in an action at law as well as in chancery."

When the damages are incomputable even approximately, they may be called irreparable, and equity will interfere, and where with the difficulty of computation there is joined insolvency, perhaps in some cases where the insolvency without the uncertainty exists, courts of chancery may decree relief to prevent a failure of justice.

The Supreme Court of Rhode Island in The American Electrical Works v. Varley Duplex Marget Co., 26 R. I. 295, has gone as far as any tribunal of a state where the distinctions between law and chancery proceedings and remedies are preserved, in upholding, on the ground of the necessary uncertainty in the estimation of damages, an injunction against the breach of a contract.

But in that case the court asserts its belief that the breach of the contract, under the circumstances alleged would tend to destroy the business reputation of the complainant. We cannot see such an element of possibly irreparable and inestimable injury in the case at bar, and we do not think, after an examination of all the many cases cited by the plaintiff in error, that justification can be found for holding that the mere difficulty of computation of damage, as distinguished from the impossibility of such computation, the difficulty being unmingled with some other element making legal relief inadequate, warrants the use of an injunctive process to enforce the keeping of contracts.

But we are disposed to go further in this case. We cannot see the great and insuperable difficulties in the approximate computation of damages in this case which seems so apparent to the plaintiff in error. We have quoted at length in the statement prefixed to this opinion the paragraph of the complainant's bill,

in which he sets forth his argument in this behalf—an argument which his counsel have repeated in the discussion of the cause before us.

The first specific statement of that paragraph is that his monthly net profits would therefore "doubtless" amount to between twelve and fifteen hundred dollars, but that a court of law could not estimate them. Undoubtedly there would be difficulty, but no insuperable one. Future profits lost by breach of contract may be recovered in a proper case, and no more difficulty exists in this case in estimating them than existed in cases where they have been recovered. If they would "doubtless" have been a certain sum, they must be capable of proof with "reasonable certainty." Chapman v. Kirby, 49 Ill. 211; Cleveland, C., C. & St. L. R. Co. v. Wood, 189 Ill. 352.

The next elements of damage asserted to be inestimable are the amounts for which complainant may become liable to persons with whom he has subcontracts which will be broken.

Computations quite as difficult as these could be are the daily accompaniments of the assessment of damages for breaches of contract in courts of law. So, too, with "commissions," which the complainant "has paid and is legally liable to pay for the obtaining of the various and numerous unexpired advertising contracts he now has."

The further statement that a court of law cannot correctly estimate the damages for the conversion or destruction or rendering useless of fixtures and equipment belonging to the complainant, is not even plausible.

On the ground alone that the complainant has an adequate remedy at law, we should hold that the injunction in this case was properly dissolved and the bill dismissed.

But this view may well be fortified by a correlative proposition. Not only do we think that the remedy at law is adequate and complete, but it seems to us that

the remedy in equity is inadequate and incomplete.

It is undoubtedly true, as contended by the complainant, that there are cases where threatened breaches of contract will be and have been enjoined, where breaches of negative covenants in contracts have been enjoined, and where such negative covenants or stipulations have been inferred from exclusive grants. So, too, it may be conceded that there are cases in which it has been authoritatively held that a court of equity will interfere by injunction where it would not decree a specific performance.

But no one of these cases is, in our opinion, like that at bar, and it would be a needless labor to discuss and distinguish them. In the case at bar, the plaintiff in error contends that even though specific performance could not be compelled, he is entitled to the relief which would be given him by obliging the defendant to lose the benefit of the breach of the contract. He admits that the temporary injunction which was granted went further than this, and his counsel still say that such an injunction restraining any breach of the contract is warranted by the authorities.

But in the event that this court, they say, is of a different opinion, they will be satisfied with an injunction merely enforcing the negative covenant implied in the grant of ''a sole and exclusive right to place advertisements in suburban passenger cars of the defendants.''

It seems very clear to us that to go farther than this would be to make a mandatory injunction to enforce a contract in a case where no specific performance could, under any theory, be decreed, and that this, under the facts of this case, is plainly inadmissible. We are forced to the conclusion in which we think we are justified by the arguments of counsel before us, that the real insistence of plaintiff in error is on the modified form of the injunction that counsel has indicated as satisfactory.

But in the case of such relief only, it rests with the

defendant itself to render it utterly nugatory to the complainant. It has only to allow no advertisements in its cars to take from the complainant any advantage of the relief granted,—save as it might gratify him to see the Railroad Company forego a possible item of income. He relies, probably, on the self interest of the company to bring about, in such a case, a renewal of the contract relations with himself; but it seems to us illogical and unreasonable to allege the difficulty of assessing damages at law as a reason for resorting to equity, if equity can only give a remedy which furnishes compulsorily no damages or compensation at all, and no enforcement of the broken contract, but only a morally coercive pressure which may lead to juster dealing. The order of the superior court dissolving the injunction and the decree dismissing the bill are affirmed.

*Affirmed.*