The Bartholomae & Roesing Brewing & Malting Company, Appellee, v. Helen Modzelewski and Brun Modzelewski, Appellants.

### Gen. No. 19,748.

1. INJUNCTION, § 67*—*when negative covenants will not be enforced.* In the absence of special circumstances, a contract which equity will not interfere directly to enforce by a decree for specific performance, it will not interfere ·to enforce by the coercion of an injunction against its violation.

2. INJUNCTION, § 75*—*enumeration of cases of enforcement of negative covenants.* Where the remedy at law for a breach of a contract is plainly inadequate because the defendant is an assignee or is insolvent, or where there are personal services involved which are unprocurable from persons other than the defendant, or where, after a sale of business good-will, a valid negative covenant in restraint of trade can be specifically enforced by injunction and the damages are presumed irreparable and unascertainable, or where the covenant is one connected with the conveyance in fee, for life or for years, of real estate, express negative covenants may be enforced.

3. INJUNCTION, § 75*—*when negative covenant not enforced.* A violation of an express covenant in contract between a saloon keeper and a brewery not to purchase any beer from any other party than the brewery will not be prohibited by an injunction where the contract further provides for liquidated damages in case default shall be made in its observance.

Appeal from the Superior Court of Cook County; the Hon. MICHAEL L. McKINLEY, Judge, presiding. Heard in this court at the March term, 1912. Reversed. Opinion filed November 24, 1913. Rehearing denied and opinion modified and refiled December 8, 1913.

**Statement by the Court.** This is an appeal under section 123 of the Practice Act, allowing appeals from

*See Illinois Notes Digest, Vols. XI to XIV, same topic and section number.

an interlocutory order or decree granting an injunction or overruling a motion to dissolve the same or enlarging the scope of an injunction order.

The order appealed from was one overruling a motion to dissolve a preliminary or *pendente lite* injunction of the Superior Court of Cook county. It was entered on July 7, 1903. The preliminary injunction had been obtained on June 6, 1913, on the face of a bill in equity theretofore filed and the report of a master before whom both parties had appeared and argued their respective contentions.

The defendants on June 10, 1913, filed an answer to the bill, and afterwards made a motion to dissolve the injunction, presenting in support of the same various affidavits preserved in the record. Complainants presented affidavits in opposition to said motion. On its denial the defendants perfected an appeal to this court, assigning as error both the entry of the order granting the injunction and the denial of the motion to dissolve the same.

The bill in the cause alleges that the complainant, Bartholomae & Roesing Brewing and Malting Company, is a brewing company manufacturing and selling beer; that the defendants, Helen Modzelewski and Brun Modzelewski, have been since May 1, 1912, owners of the premises at No. 5426 Justine street in Chicago; that on May 1, 1912, the complainant and defendants entered into a written agreement whereby the defendants agreed to conduct a saloon business continuously and exclusively upon the first floor of 4526 Justine street from May 1, 1912, up to April 30, 1917, and that during all said period they would purchase from the complainant and no other person, firm or corporation whatsoever all of the draught beer sold, used, consumed or given away by them in and about said saloon premises, for which said beer the defendants agreed to pay at the market price thereof in the city of Chicago, and further agreed ''that during said

354 APPELLATE COURTS OF ILLINOIS.

B. & R. B. & M. Co. v. Modzelewski et al., 183 Ill. App. 352.

period of time they would not purchase any draught beer for sale, use or consumption on said premises from any other person, firm or corporation than the party of the first part;" that the complainants agreed to sell and deliver to the defendants for the period of time mentioned and at the prices in said agreement mentioned (i. e. the market prices of said complainant's beers in the city of Chicago), and further agreed to loan said defendants as an additional consideration for the said covenants by them to be performed a first-class set of saloon fixtures and furniture for use by them in said premises, free from all charge and expense; that in pursuance of said agreement the complainant installed a set of saloon fixtures and appliances and said defendants began and continued to conduct a saloon business in the said premises, purchasing their draught beer from the complainant in accordance with the prices specified in said agreement until May 2, 1913, when the said defendants, without the complainant's fault, refused to purchase further draught beer for sale or consumption in said premises from the complainant, or otherwise perform the covenants in said agreement contained and removed all of the saloon furniture and fixtures of the complainant from said premises; that since said date the defendants have purchased the draught beer sold by them in said premises from the Mullen Brewing Company, and have represented to the complainant that they will continue so to do and no longer purchase draught beer from the complainant; that the complainant has fully performed all the terms and conditions of the said agreement by it to be performed, and is ready and willing to do so in the future; that it has no adequate remedy at law for the breach of said agreement "by reason of the fact that the damages which will be sustained by the complainant by reason of the continued refusal of the said defendants to carry out and perform the terms of said agreement cannot be ascertained and that it will be irreparably injured un-

less the court intervene by injunction to prevent the further violation of said agreement by the defendants.

The bill prays that on final hearing "said defendants be decreed not to purchase for sale or consumption in the said premises any draught beer from any other person, firm or corporation than the complainant up to and including April 30, 1917, and not to sell or permit to be sold on the premises described any draught beer other than that manufactured by complainant up to and including April 30, 1917," and "that said defendants be restrained and enjoined from either directly or indirectly purchasing for sale or consumption in said premises or selling or permitting to be sold in said premises any draught beer other than that manufactured by complainant and from in any manner either directly or indirectly violating said negative covenant in the contract" and that an injunction *pendente lite* issue to the same effect.

The contract in question was appended to the bill as an exhibit and made a part thereof. Besides the provisions which are set out in the bill as above abstracted it contains the following clauses:

"4.    The said parties of the second part" (the defendants) "agree to use continuously and exclusively in the conduct of said saloon business the bottled beers as manufactured and sold by the party of the first part, the United States Brewing Company of Chicago and the Val Blatz Brewing Company and will pay therefor in cash upon delivery the market price of said bottled beers in Chicago excepting such bottle beers that are specifically asked for by their patrons.

6.    The parties of the second part expressly agree that they will not permit a dramshop to be conducted on any of the properties on Justine street between 45th and 46th streets in which they have any interest of whatsoever kind and nature during the term hereof than at the premises hereinabove mentioned.

7.    The party of the first part expressly agrees that so long as the parties of the second part shall have faithfully complied with all the covenants in this con-

tract contained by them to be kept and performed, it will allow the said parties of the second part the sum of $25 per month to be applied on beer purchased during the preceding month.

8.  It is further agreed and understood by and between the parties hereto that if the parties of the second part shall at any time during the term of this contract make default herein, or fail to keep and live up to all of the covenants and agreements herein set forth to be kept and performed by them, or shall fail to purchase until the expiration hereof all the draught beer of the party of the first part and the bottled beer and pay therefor as herein provided, then and in that event they shall pay to the party of the first part as liquidated damages the sum of $50.00 per month for each and every month and fraction of a month covering the unexpired term, viz: from the date of such default to and including April 30, 1917.  The parties of the second part agree to pay such liquidated damages to the party of the first part upon demand and upon the failure of the parties of the second part to pay such liquidated damages to the party of the first part, the party of the first part shall have the right to use any and all necessary and proper means to enforce the payment of the same.    *    *    *

9.  It is further understood and agreed by and between the parties hereto that the neglect or failure of the party of the first part to enforce rights or declare forfeiture for a breach by the parties of the second part of one or more covenants in this contract contained, shall not be deemed or construed as a waiver on its part to enforce rights or declare or enforce forfeitures in case of a breach of other or similar or different covenants in this contract contained.

This agreement shall extend to and be binding upon the successors and assigns of the party of the first part, and upon the heirs, administrators, executors, successors and assigns of the parties of the second part.''

The cause having been referred to a master upon the question of an issuance of an injunction *pendente lite*, and he having reported in favor of such issuance,

the defendants and their agents were enjoined in the first instance:

"From either directly or indirectly using or suffering or permitting to be used on the premises described in said bill of complaint herein (being the premises occupied by the said defendants as a saloon and dramshop and known as number 4526 Justine street, Chicago, Illinois) any domestic draught beer other than that manufactured and sold by the Bartholomae & Roesing Brewing & Malting Company;"
and also "From directly or indirectly buying, taking or selling on said premises any draught beer whatsoever manufactured or sold by any other brewing company than the complainant."

Contemporaneously with the filing of an answer by the defendants the injunction order was modified to read:

"The court doth therefore order, adjudge and decree that said defendants * * * be and they are hereby restrained and enjoined from either directly or indirectly purchasing any draught beer for sale, use or consumption on the premises described in said bill of complaint * * * from any other person, firm or corporation than the said Bartholomae & Roesing Brewing and Malting Company."

It was in this form when the motion was made to dissolve it.

The answer, which had been filed meanwhile, was sworn to and used as an affidavit on behalf of the defendants on the hearing of said motion. The answer asserts that contemporaneously with the agreement set forth in the bill, and as a part thereof, the complainant executed another agreement, to allow the defendants 4½ barrels of beer on each monthly sales of beer of the complainant to May, 1913, if the sales of beer of said Company averaged the same as for May and July, 1912, and subsequently orally agreed, through its manager, that said allowance of beer to May, 1913, would be at the rate of 4½ barrels of beer for each 73⅜ barrels of the complainant's beer bought by the defend-

358    APPELLATE COURTS OF ILLINOIS.

B. & R. B. & M. Co. v. Modzelewski et al., 183 Ill. App. 352.

ants from the complainant from August, 1912, to April, 1913, inclusive, 73⅜ barrels being the average sale of complainant's beer to defendants for the months of May and July, 1912.

The answer admits the allegations of the bill as to the refusal on or about May 2, 1913, and subsequently to purchase draught beer from the complainant, but charges that the said actions by defendants were caused by various breaches of the contract by complainant prior to May 2, 1913. It denies the absence of any adequate remedy at law to the complainant, and insists that the damages in case of breach are liquidated in the agreement. It also alleges that the complainant has not paid the defendants the sum of $25 per month for the months of February, March or April, 1913, although said money was due from the complainant to the defendants and although prior to the purchase of beer by them from any one other than the complainant, they had demanded it for the month of February and for the month of March, 1913, and stated to complainant that unless the complainant would make such payments to them they would regard their agreement as cancelled and buy their beer elsewhere.

The answer also alleges that from August, 1912, to April, 1913, the defendants bought from the complainants 493½ barrels of beer, and under the agreement were entitled to 26¾ barrels of beer, but had only furnished them four barrels and had refused to furnish any more before they, the defendants, bought beer from anyone else, and that it was only after said breaches of the agreement by the complainant the defendants removed the fixtures of the complainant from the saloon and notified the complainant to come and get them, which the complainant did on May 6, 1913.

Besides the answer thus used as an affidavit, the defendants presented various other affidavits in support of the motion to dissolve. One made by Brun Modzelewski, one of the defendants, alleged that on or

about April 15, 1913, he made a demand on Mr. Seitz, the manager of the complainant, for $50 due under the contract for the months of February and March, 1913, and that the manager refused to give it to him and told him to get the $500 necessary to pay for a license for the period beginning May 1, 1913; that on April 17 and on April 21 and on April 25 he had interviews at the office of the complainant with Mr. Clark, the assistant manager of the complainant (Mr. Seitz being absent each time), and that at each interview the affiant demanded $50 and it was refused by Mr. Clark, who at the last interview said, ''We won't pay you; get $500 for the license and that's all; don't come around any more,'' to which affiant replied, ''If you don't pay me I won't take beer from you.'' Clark said, ''We don't care for that place—you do as you please.''

An affidavit of one Zawora, who swears he was present at the interview between Modzelewski and Clark on April 21, corroborates the former as to what happened at that interview; and one Max Ehrman in an affidavit alleges that he was present at the interview of Clark and Modzelewski on April 25, 1913, and gives substantially the same account of it as Modzelewski. He says that Modzelewski told Clark at that interview, ''If you don't keep up your contract we are going to take beer somewhere else,'' and that Mr. Clark refused to pay anything to defendants unless the defendants would pay $500 on account of the license fee to become due. According to this affidavit Modzelewski also told Clark there was beer due to the defendants from the complainant. William English also made affidavit showing that on May 7, 1913, as attorney for the defendants, he demanded of the complainant by letter $25 for the month of February, 1913, $25 for the month of March, 1913, and $25 for the month of April, 1913, and also $102 on account of an alleged agreement to allow the defendants from August 1, 1912, four barrels of beer free for every 73⅜ barrels bought by them, to which letter no answer was received. Eng-

lish also made two other affidavits, one to the effect that at an interview which as attorney for defendants he had with Mr. Seitz during the latter part of March or early in April, 1913, Seitz told him that ''although the defendants had not made monthly purchases of beer from the complainant of the same average as their purchases for the months of May and July, 1912, nevertheless the complainant would allow the defendants and furnish them free of charge four barrels of beer for as many times as the average of defendants' purchases of beer from complainant for the months of May and July, 1913, was contained in the total purchases of beer by defendants from the complainant from August, 1912, to April, 1913, inclusive. (The number of barrels thus purchased was stated in the letter of English as 493½, for which four free barrels only had been received.)

Another affidavit of English alleges advice on his part to defendants that they could not compel the complainants to allow the defendants the free barrels of beer, but that the defendants could compel the complainant to pay the defendants the $25 a month from February and March which was unpaid, and that if complainants did not pay said money to defendants on demand, complainant would be breaking its contract and defendants would not have to carry out their contract.

The complainant presented on the hearing of the motion to dissolve; the affidavits of John F. Seitz, Frederick G. Clark, Philip Reisz and Frederick Pietsch.

Seitz swore in effect that the promised allowance of beer was not a part of the agreement of May 1, 1912, that there was never a promise by the complainant to make any such allowance to defendants unless their sales averaged the same as May and July, 1912, and that they never did; that the credit of $25 a month was always shown on the books of the Company; that up to and including January, 1913, said allowance was applied to license fees advanced by the complainant

for the defendants, at their request; that the allowance of $25 a month for September, October, November and December, 1912, and January, 1913, were receipted for by the defendants by Max Ehrman (the affiant, for the defendants) and applied at their request to the license account; that the defendants did not, April 15, 1913, or at any other time, request the affiant to pay them $50 in cash for February and March, 1913, nor did the complainant refuse any such request, but that it was thoroughly understood the defendants were entitled to a credit for it either on the purchase of beer or any other account with the complainant; that all the conversations between the defendant B. Modzelewski or his attorney and the affiant were with reference to the allowances of beer.

Clark swore that the conversations in April, 1913, between B. Modzelewski and himself were all about the claim for an allowance of free beer and "that at no time did the defendant B. Modzelewski ask for an allowance of $50 for the months of February and March, 1913, nor did the said affiant or anyone in his presence at any time refuse to give the said allowance, but told the said defendant that he was entitled to an allowance of $25 per month according to the contract and no more, and that the same would be allowed to him on any account that he wanted it."

The affidavit of Clark also specifically denies the material assertions in the affidavit of Ehrman.

Reisz made affidavit that on or about April 25, 1913, when Modzelewski and Ehrman called at the office of the complainant, Clark brought them into the office of the affiant, who was an employe of said complainant, and that Clark, Ehrman and Modzelewski talked for some time in his presence, but at no time did Ehrman or Modzelewski demand payment of any part of the $25 a month allowance, but that Modzelewski said that unless the Brewery would allow him the four barrels of beer per month that he claimed he would throw out their fixtures and take other beer.

362 APPELLATE COURTS OF ILLINOIS.

B. & R. B. & M. Co. v. Modzelewski et al., 183 Ill. App. 352.

The affidavit of Pietsch, who is the head bookkeeper of the complainant, states that the books of the complainant show a credit to the account of the defendants of $25 for February, March and April, 1913; that on April 25, 1913, affiant told Ehrman in the presence of Modzelewski that the defendants had $50 coming for the months of February and March, 1913, in accordance with the contract, and were not entitled to any other allowance, and that neither said Ehrman nor Modzelewski asked affiant or anyone else in the presence of affiant for the said sum of $50.

"Affiant further says that at no time to the knowledge of affiant was any demand made for the said sum of $50, nor did the defendant or any one in his behalf request the application of said allowance for any particular purpose without such application being made in accordance with the defendant's request."

The certificate of evidence further shows that on the argument of the motion to dissolve, the counsel for the complainant stated in substance to the court and to defendants' counsel that complainant had always been willing to make the allowance of $75 and had since offered this money to the solicitor for defendants, and that defendants' solicitor had replied in substance that he would accept the $75 on condition that he be allowed to do so without prejudice to any rights which the defendants might have, to which the counsel for complainant had answered that he was not prepared to pay the money under such conditions.

JAMES P. HARROLD, for appellants.

WINSTON, PAYNE, STRAWN & SHAW, for appellee; JOHN C. SLADE, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

If our disposition of this appeal rested upon the contested matter brought into the case on the motion to dissolve the injunction, namely, whether the com-

plainant had been shown to have been guilty of a breach of the contract of May 1, 1912, prior to May 2, 1913, when it is admitted the defendants broke it and refused to purchase further beer from the complainant, we should have no hesitation in affirming, on the ground that at least this question was left so much in doubt by the affidavits and counter-affidavits, that the decision of the chancellor as to the continuance as well as to the allowance of the injunction was correct, and that until a full and fair hearing of the case on proofs other than affidavits could be had, the preliminary injunction ought to stand.

But our view of the matter is one that differs from that of the master, who recommended the injunction and whose report is found in the record, from that of the chancellor below, who granted it, and from that of the counsel for the complainants, who have ably and elaborately argued in its support on this appeal. It involves the fundamental and important question whether the express negative covenant in the contract in this case should be enforced by an injunction. This question is not complicated in this case with any of the various additional elements or collateral factors, some one at least of which has usually been present where equity has intervened in this manner to prevent the breaking of a contract. Indeed the negative answer which we think it necessary to make receives support by considerations additional to the general one we deem to be the law in the absence of special circumstances, namely, that a contract which equity will not interfere directly to enforce by a decree for specific performance, it will not interfere to enforce by the coercion of an injunction against its violation. *Welty v. Jacobs,* 171 Ill. 624.

The express negative covenant is that defendants during a prescribed time *"will not purchase any draught beer for sale, use or consumption on said premises from any other person, firm or corporation than the party of the first part."*

364 APPELLATE COURTS OF ILLINOIS.

B. & R. B. & M. Co. v. Modzelewski et al., 183 Ill. App. 352.

The additional considerations which we have noted are that there is in the contract an express stipulation for damages liquidated at a certain amount in case default shall be made in its observance, and that an injunction against the breach of the negative covenant would afford, as we said in a somewhat analogous case (*Bour v. Illinois Cent. R. Co.,* 176 Ill. App. 185) "no damages or compensation at all" (for the breach), "but only a morally coercive pressure which may lead to juster dealing."

Counsel for complainant, however, make first the distinction (which whether material or not is obvious) between cases like the *Bour* case of *implied* negative covenants and *express* negative covenants, and rest their case chiefly on the position thus expressed in their brief:

*"Where a bill seeks by injunction to restrain the violation of an express negative covenant it is not necessary to the relief sought that the complainant have no adequate remedy at law. Nor is the right to such injunction affected by the fact that the contract contains a provision for liquidated damages."*

To this proposition they cite many cases. But of these citations those which are really of authority for us, cases in the Supreme Court of this State, are comparatively few, and we think may be distinguished from the case at bar by facts to which the language used must be applied.

Where the remedy at law for a breach of a contract is plainly inadequate because of the insolvency of the defendant or because no suit at law could be maintained against the defaulting party because he is but an assignee of the contract, where such a remedy is inadequate or impossible because there are personal services involved which are unprocurable from persons other than the defendant, and are therefore incommensurable in money damages; or where, after a sale of business good-will a valid negative covenant in restraint of trade can be specifically enforced by an

injunction and the damages are *presumed* to be irreparable and practically unascertainable; or where the covenant broken is one connected with the conveyance in fee, for life or for years, of real estate, which is a peculiar kind of property affected by particular doctrines of the law, there is no doubt that express negative covenants have been enforced by injunction in Illinois as in other States and in Great Britain.

The case of *Southern Fire Brick & Clay Co. v. Garden City Sand Co.*, 223 Ill. 616, strongly relied on by complainant, actually falls within the class where, as the Court says in its opinion, the complainant could not maintain an action at law against the defendant because it was not a party to the original contract, and the Court in a portion of its opinion not only notes but places the decision upon this ground.

The case of *Lumley v. Wagner*, 1 De Gex, McN. & G. 604, and many cases which have followed it in this country, fall within the class where the damages are incommensurable with money values because the contract is for services that are unique.

As often as this case has been followed, however, it has not, as Mr. Justice Ball in this court noted in *Rabinovich v. Reith*, 120 Ill. App. 409, escaped criticism; e. g. in *Whitewood v. Hardman*, L. R. 2 Ch. Div. 428. Limited, however, to the class of cases within which *Lumley v. Wagner* and *Montague v. Flockton*, L. R. 16 Eq. 189, fall, the doctrine may be considered established.

The line of cases in Great Britain known as the *"Tied House Cases"* begins more than a hundred years ago. In 1792 a covenant in an assignment of a lease to take beer from a particular brewery was under discussion (*Hartley v. Pehall*, 1 Peake N. P. 178) and in *Holcombe v. Hewson*, 2 Campbell 391 (1810) and *Cooper v. Twihill* (1808), reported in a note to *Jones v. Edney*, 3 Campbell 285, Lord Ellenborough tried in an *assumpsit* suit and in a replevin suit,. questions arising from the breach of such covenants in leases.

366    APPELLATE COURTS OF ILLINOIS.

B. & R. B. & M. Co. v. Modzeiewski et al., 183 Ill. App. 352.

He took occasion to say in the last case that "The whole of these leases by which the people of the description of the plaintiff are prevented from having the article they deal in from those who will serve them best are extremely injurious to the public interest and welfare," and that he hoped it was the last time he should see such a provision in any lease. But his hope was certainly not fulfilled nor his opinion received with favor, for in 1869 Lord Justice Selwyn in the Court of Appeals in Chancery, rendering the judgment in *Catt v. Tourle,* L. R. 4 Ch. App. 654, said: "With respect to this particular covenant, it seems to me that the court cannot but take judicial notice of its being extremely common. Every court of justice has had occasion to consider these brewers covenants and must be taken to be cognizant of the distinction between what are called free public houses and brewers public houses, which are subject to this very covenant. We should be introducing very great uncertainty and confusion to a very large and important trade if we were now to suggest any doubt as to the validity of a covenant so extremely common as this is."

The case was a bill in equity for an injunction to restrain a defendant who had with notice acquired the land from persons who had taken a deed from the plaintiff with an affirmative covenant therein for his benefit that all beer consumed thereon should be bought from him. The right in a court of equity to an injunction was sustained on a demurrer to the bill, and the case is cited in some of the cases relied on by the complainant and may be considered a strong authority in favor of the jurisdiction of equity in England in like cases to enforce such a covenant.

The Supreme Judicial Court of Massachusetts in *Butterick Pub. Co. v. Fisher,* 203 Mass. 122, speaks of the covenant in *Catt v. Tourle, supra,* as in a lease, but says that makes no difference in principle. The covenant was not in a lease, but in a deed of the fee, practically, however, the same thing, but we think the

language and reasoning of the Lord Justices Selwyn and Giffard hardly bear out the inference that the fact that the covenant was connected with the conveyance made no difference to the decision. Lord Justice Selwyn quotes approvingly from other cases as a basis of his opinion: "That the question does not depend upon whether the covenant runs with the land is evident from this, that if there was a mere agreement and no covenant this court would enforce it against a party purchasing with notice of it, for if an equity is attached to the property by the owner no one purchasing with notice of that equity can stand in a different position from the party from whom he purchased."

And: "Reason and justice seem to prescribe that at least as a general rule where a man by gift or purchase acquires property from another with knowledge of a previous contract lawfully and for valuable consideration made by him with a third person to use and employ the property for a particular purpose in a specified manner, the acquirer shall not to the material damage of the third person in opposition to the contract and inconsistently with it, use and employ the property in a manner not allowable to the giver and seller."

Lord Justice Giffard put his opinion on the ground that "One thing at least is certain, viz.: that if the plaintiff cannot sustain a bill in this court, he is without remedy altogether, it being plain that this is a covenant which does not run with the land."

*Catt v. Tourle, supra,* therefore falls within the class where covenants of this kind, express and implied, have been enforced when connected with the conveyance and use of real property and also within the class where the contract was unenforceable at law against the person sought to be coerced.

*Lukes v. Dennis,* L. R. 7 Ch. Div. 227 (1877-1878), also is a case where a covenant was contained in a lease, although not the lease of the particular property where the violation of the covenant was involved. The same covenant was, however, contained in a mort-

gage assignment of the second lease to the brewers. An injunction (although not granted because of a compromise) was held by the court proper under condition that the brewer performed the implied agreement on his part. The defendant was, however, not the original covenanter, but his assignee with notice.

*Clegg v. Hands*, L. R. 44 Ch. Div. 503 (1889) is a leading case, giving fully the reasoning of the Vice Chancellor of the County Palatine Court of Lancaster and of the Lords Justices of the Court of Appeal on covenants tying public houses to brewers and the right to enjoin on a negative covenant like the one at bar when they occur in leases, but in that case the respective judges held that the covenant in question was a covenant relating to the way in which the business at a particular house was to be carried on, and accordingly *a covenant running with the land*. Also that whether it ran with the land or not it was enforceable in equity in favor of the assignee of the reversion, on the ground that the defendant having presumably obtained a lease of the house at a lower rent by reason of the restrictive covenant ought to be restrained from dealing with the house in a way inconsistent with the covenant.

These cases and many others in Great Britain recognizing in the given cases the validity of a negative "tied-house" covenant, express or implied, and the jurisdiction of equity to enforce it, however they may reinforce the complainant's argument would not seem to us, even if they were binding authority, to go to the extent of rendering it conclusive. There is no case that we can find in which the use of an injunction to enforce a negative contract for thus "tying" a public house to the manufacturer, unconnected with the conveyance of land, and where the controversy was between the original parties to the contract (to say nothing of the provision for liquidated damages) has been sustained, nor even one in which it seems to have been asked.

If the contention of the complainant is correct in its full extent, nothing more is necessary to turn over to courts of equity and to their summary processes for the enforcement of their orders, the practical supervision of the specific performance of any personal contract for the future purchase or sale of commodities or the rendition of services in the future, than to add to the affirmative agreement a supplementary negative one that the intending purchaser will not buy the commodity from, or the intending employe will not perform the service for, any other person than the contractee.

We understand the general rule to be very distinctly against this theory, and that it would be inconsistent with the whole spirit of our jurisprudence. The reasoning of the Supreme Court of Michigan in *Hardy v. Allegan Circuit Judge,* 147 Mich. 594, seems to us sound on this subject.

We are not convinced that the Supreme Court of Illinois are committed by the general language of Mr. Justice Wilkin in *Southern Fire Brick & Clay Co. v. Garden City Sand Co., supra,* to the doctrine, insisted on by complainant for the decision is distinctly put on the fact that no action could be maintained at law in that case for an unjustifiable breach of faith. For such a breach of faith in the case at bar, if it exists, the remedy at law is open and distinctly provided for.

Nor do we think any other opinion of the Supreme Court of Illinois goes farther than that in the *Southern Fire Brick & Clay Co.* case. Mr. Justice Shope in *Consolidated Coal Co. of St. Louis v. Schmisseur,* 135 Ill. 371, says: ''It seems to be well settled that where there is an express negative covenant courts of equity will entertain bills for injunction to prevent their breach, although the same will occasion no substantial injury or though the damages, if any, be recoverable at law.'' But he adds: ''This is upon the principle that the owner of land selling or leasing it may insert in his deed or contract just such conditions and

covenants as he pleases touching the mode of enjoyment and use of the land.''

It does not seem necessary to extend this opinion by a discussion of whether all the opinions in the Appellate Courts of this State or the opinions of courts in all other States are consistent herewith or with each other. For the considerations that are above given and which are to a large extent identical with those advanced by the Supreme Court of Michigan in *Hardy v. Allegan Circuit Judge, supra,* and by this court in *Rabinovich v. Reith,* 120 Ill. App. 409, and in *Bour v. Illinois Cent. R. Co.,* 176 Ill. App. 185, we think the injunction order should not have been granted, and, having been granted, should have been dissolved.

The order appealed from is therefore reversed.

*Reversed.*