## Fred B. Tidd, Appellee, v. General Printing Company et al., Appellants.

### Gen. No. 34,314.

Opinion filed May 29, 1930.

HAROLD L. ICKES, for appellants.

KAPLAN & KAPLAN, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal from an interlocutory injunctional order or decree, entered January 14, 1930, wherein the court, until further order, enjoined defendants and each of them from evicting complainant from the premises of the General Printing Company, located at 351–63 East Ohio Street, Chicago, and from interfering with complainant's quiet and peaceful possession. The order was granted after notice and argument solely upon the allegations of complainant's verified bill. The individual defendants are respectively the president and secretary of the defendant company.

In the bill, filed January 9, 1930, it is alleged that complainant's vocation is that of a "typesetter" and that he is and has been for several years the owner of a business and plant at No. 525 South Dearborn Street, Chicago; that defendant company is engaged, and has been since 1907, in the printing, engraving and designing business at Nos. 351–63 East Ohio Street; and that on July 21, 1928, complainant and defendant company entered into a written contract. The contract is set out in full. It is therein stated in part:

That the company is desirous "of having typesetting service *on its own premises*" and Tidd (complainant) is fully equipped to render such service; that Tidd shall deliver two linotype machines to the company's premises with a sufficient number of operators to operate the machines at capacity—keeping such operators upon the machines as may reasonably satisfy the requirements of the company for the duration of the contract; that Tidd "shall pay to the company the sum of $32 per month, as rental for the space occupied by the machines (approximately 400 square feet), shall keep said employees insured under the workmen's compensation act, and pay for all light and power used by the operators and machines"; that, in consideration of the foregoing, the company "agrees to give *all* of its linotype typesetting work  .  .  .  to said Tidd, paying therefor at the following rates and schedules" (rates and schedules set forth); that Tidd agrees that, "in the event of a competitive job, quotation will be made as reasonable as possible, but if the company can buy at a lower price it may do so without breach of contract"; that rush work, which requires overtime, shall be paid for by the company at overtime rates, when said overtime is necessitated by the volume of work required of Tidd, or because of the lateness in submitting copy; that "if, because of rush work or special jobs, the two machines are, in Tidd's opinion, unable to produce said work, then Tidd shall have the right to

turn out the work in his own plant"; that "there shall be an account stated and balanced by the parties on the 1st day of each month," and all amounts then due shall be paid by the party owing said balance not later than the 15th day of such month, in which event a discount of 2 per cent shall be allowed; that "the duration of this contract shall be *five years*" from its date; that it shall not include proof reading; and that the work delivered by Tidd shall be "of standard quality and done in a good and workmanlike manner."

It is also alleged in the bill that shortly after the execution of the contract the defendants, Lane and Black, "endeavored to handicap" complainant in numerous ways in the performance of his duties under the contract; that they have "unjustifiably found fault with him and criticized his work"; that he not only installed the two machines in the plant of the company, but also there furnished additional equipment at an expense to him of about $5,000; that he engaged experienced typesetters to do the required work and it has been done in a good and workmanlike manner; that at no time was there any cause for criticism or complaint as to the quality of any work or as to the time within which it was completed; that on November 13, 1928, "in pursuance of a conspiracy of the said Lane and Black to have the contract terminated," the company wrote to him a letter, signed by Lane, to the effect that the company "disavowed" the contract for the reason that it has never been authorized or ratified by its board of directors; that to this letter complainant replied to the effect that the contract was a binding one, that he had expended considerable sums in entering the plant of the company and in furnishing equipment, etc., and that the contract had been executed with the full knowledge of the officers and directors of the company; and that since the receipt of the letter he has continued to occupy the premises and the company has given to him typesetting work to do.

It is further alleged that on March 1, 1929, the company "increased the rental of said space, occupied by said machines, from $32 per month to $60 per month," and "required" complainant to pay one-half of the salary of a proofreader, causing an additional expense to him of $65 per month, both in violation of the contract; that the company has "failed to give to him all of its typesetting business," in violation of the contract; that during November, 1929, it failed to give to him the typesetting work in connection with the printing of a magazine known as the American Dental Magazine, and during December, it failed to give to him other typesetting work in connection with another magazine known as the Illinois Banker's Magazine, and gave the work to other parties; that it has threatened to deprive complainant of the typesetting work which it receives from Montgomery Ward & Co. in connection with the printing of one of its publications; that during said months it failed to give to him other typesetting work on numerous other jobs; that at all times he has been ready, willing and properly equipped to do all of said work; that because of its failure to give to him all such work he has been "irreparably damaged"; that the average amount of typesetting work given to him by the company from September 1, 1928, to March 1, 1929, was between $3,200 and $3,500 per month; and that, because it has since failed to give to him all of its typesetting work, his income has been reduced by about $500 or $600 per month.

It is further alleged that, after threats made by Lane and Black to oust complainant from the possession of said space allotted to him, the company on December 31, 1929, caused to be served upon him a written notice, stating that it had elected to terminate his tenancy of the space, and demanding that he vacate and deliver up possession of the same by February 1, 1930.

In addition to a prayer for general relief the bill prays for an accounting, and that defendants, and each

of them, be enjoined "from evicting your orator from the space occupied by him" in the company's plant, "and from giving any of their typesetting work to any person, firm or corporation other than your orator and from doing their own typesetting work." The court on the application for a temporary injunction declined to enjoin any of the defendants from doing their own typesetting work, or from having it done by others than complainant, but entered the temporary injunction as first above mentioned.

It will be noticed that the bill alleges various breaches on the part of defendant company of an unexpired contract and in effect prays, in addition to an accounting, that a court of equity decree specific performance of the contract on the part of defendant company, and that pending the hearing the company be restrained from carrying out its threats to evict complainant from that part of the company's premises wherein his two machines are installed.

We do not think that the bill states such facts as warrants a court of equity in granting the relief as prayed. And we think what is said in *Harley v. Sanitary District,* 54 Ill. App. 337, 339, is particularly applicable, viz.:

"The bill does not in terms pray a specific performance of the contract, but under the prayer of general relief, such performance might be enforced if the nature of the contract permitted it, and an injunction as the bill prays would necessitate such enforcement as a consequence; . . . Now, that such a contract cannot be specifically enforced in equity is familiar law. The principle is stated in *Grape Creek Coal Co. v. Spellman,* 39 Ill. App. 630. As is there said (p. 632): 'It is apparent that the damages alleged can be ascertained at law, and we see nothing to prevent the application of the general rule, that chancery will not entertain a bill to specifically enforce contracts relating to personal property, nor contracts which by their

terms call for a succession of acts whose performance cannot be consummated by one transaction, and which require protracted supervision and direction.' And, 'where an agreement is of such a nature that it is practically impossible for a court to enforce it, and the bill for an injunction is in effect a bill for a specific performance, equity will not interfere.' High on Injunctions, sec. 1162.'' (See, also, *Lee v. Chicago League Ball Club,* 169 Ill. App. 525, 530.)

And it is well settled law that, if from the bill it appears that a complainant cannot have the ultimate relief as prayed, an interlocutory injunction should not be granted. In *Hovnanian v. Bedessern,* 63 Ill. App. 353, 355, it is said: ''The only purpose of an interlocutory injunction is to protect complainant until the merits can be determined. If he can have no relief at the hearing, he can have no interlocutory injunction.'' (See, also, *Koelling v. Foster,* 150 Ill. App. 130, 134; *Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co.,* 256 Ill. App. 357, 361.)

And we think that for other reasons the order for the temporary injunction, under the facts as alleged in the bill, should not be allowed to stand. In 18 Ency. Law (2d Ed.) pp. 171–2, it is said:

''Where the relation of master and servant or employer and employee exists between the owner of the premises and the person occupying them, and the possession of the servant or employee is an incident to the service or employment, the conventional relation of landlord and tenant ordinarily does not exist between the parties with respect to such occupancy. The character of the relation depends upon the nature of the holding, whether it is exclusive and independent of the service and in no way connected therewith, or whether it is so connected or is necessary for the performance of the service. (Citing *Chatard v. O'Donovan,* 80 Ind. 20.) . . . In determining whether such occupany is

incident to the service or employment, the general rule has been laid down that when the occupation by the servant is required by the master for the necessary and better performance of the service, the occupancy is incident to the service, and the relation between the parties is that of master and servant, and not that of landlord and tenant.'' (Citing *Kerrains v. People,* 60 N. Y. 221.)

In the cited *Chatard* case it was held in substance that where the occupation of a house by a servant or employee is connected with the service, or is required by the master or employer for the better performance of that service, the occupier is not to be considered as his tenant, and that, upon a termination of the service, the right of the servant or employee to occupy the house ceases. In the cited *Kerrains* case, under a similar state of facts, it was held in substance that a tenancy at will or at sufferance does not spring up immediately upon the termination of the service but that, to have that effect, the subsequent occupancy must be sufficiently long to warrant an inference of consent to a different holding; and it was further held that the deduction of a specified sum from the wages for the use of the premises, though a material circumstance, was not conclusive as to the nature of the holding.

In *Crain v. Burnett,* 190 Ill. App. 407, it appears that in 1904, a Mrs. Hamilton entered into a contract with Burnett whereby she was to pay him $50 per year and furnish him with board and lodging in a house on premises in which she had a life estate with all the rights of possession and control during her lifetime, and whereby, in return, Burnett was to render certain specified services, furnish household supplies and also care for her ''through health, sickness and death.'' In August, 1910, Mrs. Hamilton was found to be a distracted person and one Parsons was ap-

pointed conservator of her person and estate, and he, as such conservator and with the approval of the county court, made a contract with Crain by which he was to move into the premises, care for Mrs. Hamilton and furnish her food, clothing and maintenance, and for which he was to have the use of the premises and $41.65 per month. On August 30, 1910, Crain made written demand on Burnett for the immediate possession of the premises and on the same day the conservator, on behalf of Mrs. Hamilton, made written demand on Burnett that he deliver up possession of the premises within 30 days. Burnett, however, continued to live on the premises, and on October 1, 1910, Crain commenced an action in forcible detainer against him. The trial court found Burnett guilty of unlawfully withholding possession of the premises and entered judgment in favor of Crain. On Burnett's appeal to the Appellate Court for the Third District the judgment was affirmed. The court in its opinion held (p. 411) that the contract did not give Burnett any right to the possession or any control over the premises during Mrs. Hamilton's life; that the relation between them was one of master and servant or employer and employee; that the only right of occupancy or possession that Burnett had under the contract was such as was necessary for or incident to the performance of the services to be rendered by him; and that such right did not create the relation of landlord and tenant. After stating that there was no evidence in the record disclosing Burnett's failure to perform his duties under the contract, the court further held, conceding that he was not in default, that "the demand for possession of the premises was a discharge of appellant (Burnett) and a termination of the contract for service," and further held:

"Where an employee occupies a house incidentally to his employment and he is discharged, *whether the discharge be rightful or wrongful,* he *must vacate* the

premises occupied by him as such employee. If he fails to leave peaceably, or after doing so returns, he becomes a trespasser and may be ejected by the master although his wages have not been paid." (Citing 26 Cyc. 996; the *Kerrains* case, *supra; Champion v. Hartshorne,* 9 Conn. 564, and other cases.)

In *Mackenzie v. Minis,* 132 Ga. 323, Mackenzie entered into a three-year contract with his employer, wherein he agreed to perform all the duties of a gardener and manager of his employer's summer home to the latter's satisfaction. In addition to a stated compensation he was to be provided free with a house on the premises and with fuel, vegetables, etc. He entered upon his duties and occupied the house. About the middle of the third year his employer notified him in writing that he was discharged and directed him to remove himself and all his effects from the premises by a certain time. He continued to remain, insisting that under the contract he could not be discharged until the expiration of its term. It was held in substance that it was his duty to leave the premises and remove his personal effects, and that his retaining possession of the house and acting as if there had been no discharge made him a trespasser.

In view of these authorities, we think that defendant company's notice and demand of December 31, 1929, as alleged in the bill, amounted to a discharge of complainant from his employment and a termination of the contract, and that he, even though wrongfully discharged, was not entitled to the injunctional or other equitable relief as prayed for. If his discharge and the termination of the contract were wrongful, and not because of any default on his part, there is an adequate remedy at law for damages for breach of the contract. In *Bartholomae & Roesing Brewing & Malting Co. v. Modzelewski,* 183 Ill. App. 352, 363, it is held that, in the absence of special circumstances, "a contract which equity will not interfere directly to enforce by a decree

for specific performance, it will not interfere to enforce by the coercion of an injunction against its violation.'' (Citing *Welty v. Jacobs,* 171 Ill. 624.) In *Bour v. Illinois Cent. R. Co.,* 176 Ill. App. 185, 199, it is held that on a breach of contract the mere difficulty of computation of damages, as distinguished from the impossibility of such computation, the difficulty being unmingled with some other element making legal relief inadequate, will not warrant the use of an injunctive process to enforce the keeping of the contract.

Our conclusion is that the order for the temporary injunction appealed from was improvidently granted, and it is accordingly reversed.

*Reversed.*

Barnes, P. J., and Scanlan, J., concur.