SEYMOUR KESSLER, D.P.M., Plaintiff-Appellee, v. CONTINENTAL CA-
SUALTY COMPANY *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 84—1888

Opinion filed April 2, 1985.—Rehearing denied April 30, 1985.

Reuben & Proctor, of Chicago (Don H. Reuben and William J. Campbell, of counsel), for appellants.

Joyce & Kubasia, P.C., and Madigan, Stanner, Kahn, Bonifacic & Getzendanner, both of Chicago (Edward T. Joyce, Michael M. Moirano, and Lawrence T. Stanner, of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This case involves an interlocutory appeal by the defendants, two insurance companies, from the issuance of a preliminary injunction prohibiting them from nonrenewing or otherwise failing to provide malpractice insurance for plaintiff's podiatric services until plaintiff, as an insured, is given full claims and insurability review by the Professional Liability Review Committee and the insurance companies.

The facts disclose that plaintiff Seymour Kessler (plaintiff), a podiatrist and one of the founders and current members of the Academy of Ambulatory Foot Surgeons (AAFS), sought a preliminary and permanent injunction against the defendants, the two insurance companies (collectively CNA), which had provided malpractice insurance to plaintiff for three policy years under a program sponsored by the AAFS. Plaintiff sought to require CNA to renew his most recently expired policy and to continue providing him with malpractice insurance until such time as the defendant fully complied with its obligations under plaintiff's policy and the AAFS malpractice insurance program agreements.

In the fall of 1980, AAFS, a society of podiatrists specializing in outpatient foot care and strong proponents of a surgical technique called "minimal incision surgery," entered into an agreement with CNA to co-sponsor a professional liability insurance program for AAFS members. A written contract was executed on June 1, 1981 (the AAFS Agreement).

Plaintiff alleged in his complaint that the development of the minimal incision surgery technique, which can be performed in a physician's office or on an outpatient basis, had the effect of reducing medical care revenue to podiatric hospitals and to podiatrists having a practice based on an inpatient surgery and confinement basis. As a result of this economic threat, the hospital-based podiatrists and others attacked the minimal incision procedure and, through their repre-

sentative group, the American Podiatry Association (APA) allegedly sought to impede the proponents of the procedure from qualifying as certified diplomats of the American Board of Podiatric Surgery. This animosity led the proponents to form their own national organization, the AAFS, which then embarked on providing malpractice insurance for its members. This ultimately led to the AAFS Agreement mentioned above.

At the hearing for the preliminary injunction, one Dr. Plon testified as to the history of the AAFS and the special needs which caused the AAFS to develop its own program with CNA as the carrier. Plon, a co-founder of the AAFS with plaintiff, testified as to meetings between members of the AAFS board, which included plaintiff and was responsible for finding an appropriate insurance carrier, and members of CNA. Specifically, Plon testified that the concept of peer review and claims review was vitally important to the AAFS and was one of the major reasons the AAFS wanted its own insurance program apart from any program sponsored by the APA. Plon testified that, when he and plaintiff were looking for a new insurance company to insure AAFS after its old carrier was determined to be unsatisfactory, CNA was selected as the carrier because of its representations that it could meet the special requirements of the AAFS. Plon also testified that CNA, in his opinion, did not perform under the AAFS Agreement in the manner he and the AAFS originally thought it would. Namely, no information was apparently given by CNA to the appropriate committee of the AAFS enabling AAFS to review the merits of claims filed against members and advise CNA accordingly, and, if necessary, offer expert witnesses to fight claims thought to be nonmeritorious.

The AAFS Agreement did not provide for automatic group coverage. Rather, the AAFS was empowered to create a Professional Liability Review Committee which would work with CNA in administering the program. Relevant portions of the AAFS Agreement provide as follows:

> "CNA shall have the sole and exclusive authority to accept or reject an application for insurance from a podiatrist.
>
> * * *
>
> The insurance provided hereunder will be offered as long as the podiatrist meets the approval of the AAFS Professional Liability Review Committee and continues to meet CNA's underwriting criteria. No quota or limit shall apply to the number of podiatrists as participants in the program.
>
> * * *
>
> The Academy will assist CNA in establishing general under-

writing criteria and eligibility standards for the insurance program. While the criteria and standards are intended as general guidelines, CNA may use such other relevant considerations as it deems material in determining eligibility for the insurance program. CNA agrees to offer the insurance program to podiatrists who, in the judgment of CNA qualify, pay the premiums when due, and continue to meet CNA's general underwriting criteria and eligibility standards.

\* \* \*

The role of the Professional Liability Review Committees is advisory in nature and as such the members of [said committees] shall not be liable to CNA for findings, recommendations or decision made."

Plaintiff subsequently obtained professional liability insurance under the program with CNA for three policy years from January 31, 1981, to January 31, 1984. During the term of plaintiff's contract, a total of 40 claims were filed against him. After reviewing plaintiff's three-year claims history, CNA determined that it would not renew plaintiff's insurance coverage, allegedly because plaintiff's loss experience had become deleterious. CNA sent plaintiff one notice of nonrenewal on December 15, 1983, and another on December 27, 1983, citing plaintiff's alleged noncompliance with underwriting criteria. Plaintiff claims that CNA's decision to nonrenew him was based on its use of a secret underwriting "grid" which provided for automatic nonrenewal when four or more claims were filed in three years against an insured, regardless of the merits of the claims or the volume of the insured's practice. Plaintiff contends that CNA's use of this grid was violative of the basic understanding between AAFS and CNA to provide for AAFS peer review of claims, and is inconsistent with the AAFS Agreement and the negotiations leading thereto. Plaintiff further contends that CNA's use of the grid is inconsistent with advertising brochures issued by CNA to AAFS members, like plaintiff, who were obtaining insurance through the program. CNA claimed that the decision to renew was solely within the province of CNA. CNA also claimed that the provision in the AAFS Agreement for AAFS advisory review relates to insurability, the initial decision to accept or reject an applicant, and not to renewal, the decision to enter into a new insurance contract upon the automatic expiration of the existing policy. CNA further maintained that plaintiff has no legal interest or right in any provision of the AAFS Agreement and that nowhere does plaintiff's own insurance contract provide for claims review or peer review.

On February 29, 1984, plaintiff filed a complaint in chancery for an injunction and other relief. The essence of plaintiff's complaint was that CNA's refusal to renew his malpractice insurance was a breach of CNA's duty arising under the AAFS program agreement with the AAFS and its members as well as a breach of CNA's policy obligations to plaintiff. Effective January 31, 1984, plaintiff's insurance had been extended through March 1, 1984. On February 29, 1984, the trial court issued a temporary restraining order, based upon plaintiff's motion for a temporary restraining order filed contemporaneously with his complaint, prohibiting CNA from nonrenewing plaintiff's insurance pending a hearing on the preliminary injunction.

At the hearing on the preliminary injunction, CNA contended that plaintiff's alleged rights, purportedly arising out of preliminary negotiations between AAFS and CNA and advertisement brochures, simply did not exist. CNA objected to the parol evidence offered by plaintiff because there was no mention of peer review in plaintiff's contract, because the AAFS Agreement was fully integrated, and because the AAFS Agreement specifically precluded third-party rights. The trial court subsequently entered an order which stated, *inter alia*, that plaintiff had a right to rely on CNA's representations regarding claims review and insurability review by the AAFS Professional Liability Review Committee and CNA, that there was no such review prior to plaintiff's receipt of a notice of nonrenewal, that plaintiff had the right to proper notice and to be presented with specific reasons for nonrenewal, that these were rights deserving equitable protection suggesting a likelihood that plaintiff could succeed on the merits, that plaintiff would suffer irreparable harm if coverage was not renewed and that plaintiff had no adequate remedy at law. Consequently, upon those findings, the trial court ordered that a preliminary injunction be entered prohibiting CNA from nonrenewing plaintiff's malpractice insurance until plaintiff has been given full claims and insurability review by the AAFS Professional Liability Review Committee and CNA. CNA filed this interlocutory appeal pursuant to Supreme Court Rule 307.

■ In the present action, the trial court's order prohibited CNA from nonrenewing or otherwise failing to provide insurance for plaintiff's podiatric services until plaintiff received full claims and insurability review. The tendency and effect of that order is to require CNA to insure plaintiff even though, absent judicial action, CNA had nonrenewed plaintiff's insurance, and plaintiff's insurance policy had expired by its terms. Such an order is clearly mandatory in nature. Mandatory preliminary injunctions are not favored, and the only justi-

fication for such an order is the maintenance of the status quo to avoid irreparable injury. (*Halvorsen v. Richter* (1976), 37 Ill. App. 3d 344, 346, 345 N.E.2d 220.) In order to establish irreparable injury, the plaintiff must show that his legal remedy is inadequate in that money damages will not be adequate compensation or the damages escape pecuniary valuation. *Bally Manufacturing Corp. v. JS & A Group, Inc.* (1980), 88 Ill. App. 3d 87, 94, 410 N.E.2d 321.

■ The trial court's order recites that plaintiff would suffer irreparable injury if his insurance was not continued in that, without insurance, his services to his patients and the public would be greatly impeded, if not terminated, that his reputation would be ruined, and that his economic status would be seriously handicapped. We find, however, that these averments of irreparable harm are not sufficient in either kind or degree to compel an insurance company to continue providing coverage where it has the authority to discontinue coverage and so chooses to discontinue coverage.

■ The issuance of a preliminary injunction is a matter solely within the discretion of the trial court, and its determination will not be disturbed on appeal absent an abuse of discretion. (*Kirsner v. Johnson & Johnson Products, Inc.* (1983), 118 Ill. App. 3d 564, 565, 455 N.E.2d 292.) When considering the propriety of a preliminary injunction, the trial court does not decide contested issues of fact. (*Rotary Club v. Harry F. Shea & Co.* (1983), 120 Ill. App. 3d 988, 995, 458 N.E.2d 1002.) In the present action, plaintiff alleged that CNA was improperly nonrenewing his insurance because it failed to provide him claims review and failed to give him 90 days' notice allegedly required under his policy. It is undisputed here that CNA gave plaintiff at least 30 days' notice required by section 143.17 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 755.17), which compels an insurer to continue coverage until the insured obtains similar insurance when an insurer does not send 30 days' advance notification of a decision to nonrenew. Thus, there was no statutory basis to continue plaintiff's insurance coverage. Plaintiff claims, however, and the trial court apparently found, that the notice of nonrenewal was not sufficiently specific as required by section 143.17(e) because it only gave as a reason for nonrenewal plaintiff's "noncompliance with company writing guidelines." However, in *Steward v. Allstate Insurance Co.* (1980), 92 Ill. App. 3d 637, 415 N.E.2d 1206, this court found a notice sufficiently specific that stated the reason for nonrenewal as "poor loss experience." (92 Ill. App. 3d 637, 644.) In a trial on the merits, the notice here may ultimately be found not sufficiently specific. However, for purposes of ruling on the issuance of a mandatory

preliminary injunction, this was not a question appropriately resolved. Thus, we are left to determine whether, in the absence of insurance, the sort of injury facing plaintiff was properly classified as "irreparable." As stated, we do not.

If CNA wrongfully nonrenewed plaintiff's policy, his appropriate remedy was a suit for damages. At this stage of the litigation, there was no basis for a statutory extension of coverage. Consequently, until plaintiff is able to secure alternative insurance due to CNA's alleged wrongful nonrenewal, his damages are the extra cost of securing a replacement policy, the cost of defending any claims filed against him while he is uninsured, and the lost profits due to his practical inability to practice medicine without insurance. All of these items are amenable to pecuniary valuation in amounts adequate to compensate plaintiff in a contract action. Lost profits can be measured on the basis of past performance and present predictions of future performance. (See *Tidd v. General Printing Co.* (1930), 257 Ill. App. 596, 606.) The difference in premiums would be a mere matter of subtraction, and the cost of defending claims is readily verifiable. We fail to see how money damages would be neither adequate nor ascertainable. Where a contract gives the insurer a right to nonrenew, the temporary lack of insurance resulting in lost profits and other associated expenses does not, without more, justify the issuance of a preliminary injunction. *Cf. Fahey v. Holy Family Hospital* (1975), 32 Ill. App. 3d 537, 544, 336 N.E.2d 309.

The trial court also referred to damages to plaintiff's reputation. However, damages to plaintiff's professional reputation cannot, generally, serve as a basis for a finding of irreparable injury (see *Sampson v. Murray* (1974), 415 U.S. 61, 91, 39 L. Ed. 2d 166, 187, 94 S. Ct. 937, 953), especially in the absence of any affirmative testimony or evidence that plaintiff's reputation would be or has been tarnished. (See *Hoffman v. Wilkins* (1971), 132 Ill. App. 2d 810, 819, 270 N.E.2d 594.) Moreover, we question whether the alleged damages to plaintiff's reputation necessarily follow from the nonrenewal of his insurance, or if such damages are more likely incidental to the numerous malpractice claims filed against him. See *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center* (7th Cir. 1982), 684 F.2d 1346, 1350.

Plaintiff also claims that no alternative insurance is available, and one witness did testify to that effect. However, there was also evidence introduced that plaintiff could probably secure alternative insurance for $125,000 per year, but that plaintiff was not willing to spend that much. Assuming CNA wrongfully nonrenewed plaintiff's insurance, the difference in premiums would be a likely damage as-

sessment against CNA. None of plaintiff's injuries, either singularly or cumulatively, can serve as the basis for the injunction here issued which has the unusual effect of compelling an insurer to provide insurance. The preliminary injunction here is akin to ordering CNA to specifically perform its contract with plaintiff in spite of the fact that the terms of the contract are in apparent dispute and there has been no determination on the merits. (See *Nu-Enamel Distributors, Inc. v. Nu-Enamel Corp.* (1942), 315 Ill. App. 494, 43 N.E.2d 205 (abstract of opinion).) Under these facts, we find such an order irregular and inappropriate. Plaintiff's possible injuries are not sufficient in magnitude to warrant the imposition here placed upon CNA. CNA would be responsible for the defense and payment of any claims filed against plaintiff during the period the injunction is in force. This, when compared with the possible harm facing plaintiff, which can be adequately compensated at law, further compels us to dissolve the injunction.

For these reasons, we find that the trial court's order was an abuse of discretion. We therefore order the injunction against CNA dissolved and the action remanded to the trial court.

Reversed and remanded.

PERLIN and BILANDIC, JJ., concur.