No. 2--98--0045

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

LAKE IN THE HILLS AVIATION ) Appeal from the Circuit Court

GROUP, INC., GARY MEISNER, ) of McHenry County.

HOWARD SEEDORF, and GERALD )

FINEFIELD, )

) 

Plaintiffs-Appellees, )

)

v. ) No. 97--MR--282  

)

VILLAGE OF LAKE IN THE HILLS, ) Honorable

) James C. Franz,

Defendant-Appellant. ) Judge, Presiding.

PRESIDING JUSTICE GEIGER delivered the opinion of the court:

The defendant, Village of Lake in the Hills (Village), appeals from the December 19, 1997, order of the circuit court of McHenry County preliminarily enjoining it from taking possession of the Lake in the Hills Airport from the plaintiffs, Lake in the Hills Aviation Group, Inc., Gary Meisner, Howard Seedorf, and Gerald Finefield.  On appeal, the Village argues that the entry of a preliminary injunction was improper because the plaintiffs failed to present sufficient evidence demonstrating that they were entitled to such relief.  We reverse and remand.

The facts relevant to the disposition of this appeal are as follows.  The Village is a municipal corporation which owns the Lake in the Hills Airport (airport).  In February 1992, the Village entered into an Airport Operating Agreement (operating agreement) with Lake in the Hills Aviation Group, Inc. (the Av Group).  Gary Meisner, Gerald Finefield, and Howard Seedorf each own a one-third share of the Av Group.  The term of the operating agreement was from February 12, 1992, through February 11, 2004.

Under the provisions of the operating agreement, the Av Group was designated as the "operator" of the airport and took possession of the airport premises on February 12, 1992.  As operator, the Av Group was required to provide certain services at the airport, including aircraft sales, aircraft maintenance, charter services, and flight training facilities.  The operating agreement permitted the Av Group to provide these services directly or by subcontract.  In addition, the Av Group was obligated to collect all revenues and pay all expenses associated with the operation of the airport.  The operating agreement also required the Av Group to pay the Village $6,000 per month plus a percentage of the gross revenue it received from its operation of the airport.

Additionally, the operating agreement required the Av Group to operate the facility as a public airport at all times.  The Av Group was also required to comply with all applicable municipal, federal, and state laws and regulations relating to airports.  In the event that the Av Group failed to abide by the terms of the operating agreement, the Village had the right to terminate the operating agreement and to reenter the airport premises.

In 1992, the Av Group subcontracted the aircraft sales, aircraft maintenance, charter, and flight school services to various companies individually owned by Meisner, Finefield, and Seedorf.  The aircraft sales service was subcontracted to Meisner Aircraft Sales, which was owned by Meisner.  The aircraft maintenance service was subcontracted to Finefield Aviation, which was owned by Finefield.  The charter and flight school services were subcontracted to Northern Illinois Flight Center, which was owned by Seedorf.  These subcontract agreements provided for a monthly lease payment to the Av Group and were automatically renewable on a yearly basis.  Although the Av Group paid the Village a percentage of these lease amounts, the Village did not receive a percentage of the gross revenues of Meisner Aircraft, Finefield Aviation, or Northern Illinois Flight Center.

On May 10, 1996, the Village was notified that the Illinois Department of Transportation (IDOT) had received a formal letter of complaint concerning the operation of the airport.  The complaint had been made by Fred Shay, president of Blue Skies Flying Services (Blue Skies).  Shay operated a flight school out of the airport.  Shay complained that Seedorf had refused to sell him airplane fuel and had assaulted and harassed his employees.  Shay also complained that the Av Group would not provide him with an agreement to operate at the airport unless he complied with certain requirements, including an EPA storm water protection permit, $5 million in insurance coverage, and the payment of other monthly fees.

IDOT warned the Village that, under the terms of a $200,000 development grant the Village had received from the state, it was required to control and operate the airport "for the rightful, fair, equal, and uniform use and benefit of the public."  IDOT explained that the Village could not deny access to the airport or its facilities to any individual or company desiring to do business at the airport unless there were compelling reasons justifying such a denial.  IDOT also suggested that there was a conflict of interest in permitting the primary service providers at the airport to serve in the capacity of operator.  IDOT recommended that the Village create a set of operating rules and regulations and develop separate agreements, leases, or contracts for the airport operator and the various subcontractors.  Although the Village apparently spoke with IDOT about these problems, it took no formal action to remedy them.

On October 9, 1996, the Village was notified that IDOT had received another complaint about the Av Group.  This complaint was made by a teacher at Prospect High School who used the airport to teach his physical science and aeronautics class.  Apparently, Seedorf refused to sell the teacher fuel once he began renting planes from Blue Skies.  IDOT warned the Village that the airport would not be considered for further state and federal airport funding until these discriminatory practices were remedied.  Under IDOT’s Proposed Airport Improvement Program, the airport had previously been designated to receive $8.5 million in federal and state funds between 1996 and 1999. 

On October 10, 1997, the Village sent the Av Group notice that it was in default on the operating agreement.  The notice provided the following specific violations of the covenants contained in the operating agreement:

"1.  Failing to pay the Village the applicable percentage of gross revenues received by Messrs. Seedorf, Meisner and Finefield and their business entities as 'subcontractors' of [the Av Group];

2.  Arbitrarily and discriminatorily refusing to sell fuel and lease unoccupied hangar space to Blue Skies Flight Services, Inc. *** or its clients;

3.  Arbitrarily and discriminatorily refusing to allow other commercial enterprises to operate at the Airport;

4.  Arbitrarily and discriminatorily  refusing to offer a tie-down agreement to Blue Skies on terms equally applicable to others;

5.  Operating as the exclusive Fixed Base Operator at the Airport in violation of 49 U.S.C. § 40103(e), applicable to the Airport by reason of paragraph 10.2 of the Agreement and state grant assurances; and

6.  Violating, by virtue of the foregoing actions, the FAA regulations regarding airport use ([14] C.F.R. [Pt.] 152, App. D), applicable to the Airport by reason of paragraph 10.2 of the Agreement and state grant assurances."

The notice further provided that the operating agreement would be terminated on December 10, 1997, and that the Village would re-enter the airport premises on that date.

On December 3, 1997, the Av Group, Meisner, Finefield, and Seedorf (collectively, plaintiffs) filed the instant declaratory judgment action.  The plaintiffs alleged that they had fully performed their obligations under the operating agreement and that they had not breached any of its conditions or terms.  The plaintiffs requested a judgment declaring them to be in compliance with the terms of the operating agreement and that the Village was not entitled to reenter the airport and remove them from the premises.

Also on December 3, 1997, the plaintiffs filed motions for the entry of a temporary restraining order and a preliminary injunction.  On December 8, 1997, the trial court entered a temporary restraining order prohibiting the Village from reentering the airport to remove the Av Group and from taking possession of the premises.

On December 18, 1997, the trial court held a hearing on the motion for preliminary injunction.  At the hearing, Seedorf testified that the Av Group had made every single monthly payment due to the Village under the agreement, including a monthly percentage of Av Group’s gross receipts.  These payments totaled over $500,000.  He testified that the Village did not receive a percentage of the gross revenues of Meisner Aircraft, Finefield Aviation, or Northern Illinois Flight Center because they were not the "operator" of the airport.  Rather, these businesses had contracted with the Av Group to provide services at the airport.

On cross-examination, Seedorf testified that any prospective businesses that wished to rent hangar space at the airport were required to execute a rental agreement.  This agreement prohibited the business from conducting any commercial activity in the hangar without the express written permission of the Av Group.  At no time did the Av Group ever permit any individual or business to conduct commercial activities in the airport hangars.  However, Seedorf acknowledged that the Av Group waived this prohibition for Northern Illinois Flight Center.  Therefore, Seedorf’s business was permitted to conduct commercial activities in the airport hangars.

Seedorf also acknowledged that, on December 12, 1995, he sent Fred Shay a letter indicating that, in order for Blue Skies to operate at the airport, he would have to comply with certain requirements, including (1) the execution of a commercial operating agreement; (2) $5 million in liability insurance coverage; and (3) the payment of an annual $2,500 fee for an Illinois EPA storm water protection and pollution prevention plan.  Appended to this letter were purported excerpts of a document entitled "Lake in the Hills Airport Policy."  The document detailed additional monthly fees due to the Av Group for each instructor or mechanic that would be working at the airport.  Similar demands were made to the other businesses that sought to operate out of the airport.

Seedorf acknowledged that these requirements had not been officially approved by the Village.  He also acknowledged that none of these fees were ever paid by Meisner Aircraft, Finefield Aviation, or Northern Illinois Flight Center.  Additionally, none of the plaintiffs’ businesses carried $5 million in insurance coverage.  Seedorf acknowledged that, under the terms of the operating agreement, only $1 million in coverage was required.

Finefield also testified at the hearing.  Included in his testimony was an explanation of the content of certain conversations among Meisner, Seedorf, and Finefield at the time the operating agreement was executed.  He testified that, based upon these conversations, it was his understanding that only Meisner Aircraft would be permitted to provide aircraft sales service at the airport, only Finefield Aviation would be permitted to provide maintenance services at the airport, and only Northern Illinois Flight School would be permitted to provide flight instruction.

Maureen Cousins testified that she is one of the owners of Valley Service, Inc. (Valley Air).  Valley Air is an executive air charter company that has been operating at the airport since May 1995.  Cousins testified that Valley Air encountered significant difficulties from Seedorf in setting up operations at the airport.  Seedorf told her that the airport was private and that there was no space for commercial hangars.  In an effort to commence operations at the airport, Cousins was required to speak with her attorney, IDOT, and the Village.  Although she was eventually permitted to operate at the airport, she has never been given an operating agreement despite repeated attempts to obtain one.  Additionally, although Valley Air has a hangar at the airport where it stores its aircraft, it has not been permitted to conduct any commercial operations out of the hangar.  Cousins testified that Valley Air has continually refused to comply with Av Group’s requirement that it purchase $5 million in insurance.

Fred Shay testified that he is the president of Blue Skies.  Blue Skies is a flying school and aircraft dealership.  Shay testified that his company operates out of an office outside of the airport because it has not been permitted to conduct any commercial operations out of its hangar on the airport premises.  Shay explained that when he first approached Seedorf about operating at the airport, Seedorf advised him of the insurance and fee obligations described above.  Shay refused to pay these fees and hired an attorney to contact the Village directly.  Eventually, Shay was permitted to begin operations at the airport in February 1996.  After Shay commenced operations, Seedorf refused to sell him fuel to operate his planes.  On one occasion, Seedorf told Shay that the "airport was [Seedorf's]" and that "[Seedorf] could do whatever he wanted."  Shay reported these incidents to IDOT.  The Av Group later terminated Shay’s hangar lease and commenced litigation to evict him.  This litigation was later settled, and Blue Skies was permitted to continue its operations at the airport.

Lynn Hadler testified that he operates Motive Services Company, an aircraft maintenance company.  Hadler has operated his business out of two hangars at the airport since 1982.  In 1996, he received a notice from Av Group indicating that his lease was being terminated because he was conducting commercial activities in his hangars.  The Av Group also initiated litigation against Motive Services, seeking to evict it from the airport.  Once again, the litigation was settled, and Motive Services was permitted to continue its operations at the airport.

James Bildilli testified that he was the bureau chief of aviation, education, and safety for the aeronautics division at IDOT.  He testified that it was improper for an airport operator to request a business to pay the fee necessary to obtain an EPA storm water permit.  He also testified that $5 million in insurance required by the Av Group was unnecessary for the type of business that Shay was operating.  In a letter to the Village, Bildilli noted that it was unsafe for Seedorf to refuse to sell fuel to the businesses at the airport, as it would require pilots to fly aircraft to other airports for the purposes of fueling.  Finally, Bildilli testified that the airport was not eligible to receive federal or state funds because of the Av Group’s discriminatory practices and the "exclusive rights" situation created as a result of the operating agreement.

At the close of the hearing, the trial court granted the plaintiffs’ motion for a preliminary injunction.  The injunction provided as follows:

"The Village *** [is] prohibited and enjoined from re-entering the airport premises of the Lake in the Hills Airport *** for the purpose of removing the [p]laintiffs from all publicly owned property and [is] also enjoined from taking possession of the airport premises and any property, books, records, and things associated therewith during the pendency of this cause."

The trial court also denied the Village’s request that the plaintiffs be required to post a bond.  The Village had argued that such a bond was necessary to protect its interests, particularly in light of the fact that it might lose $8.5 million in federal and state grant funds.  On January 12, 1998, the Village filed a timely interlocutory appeal.  On February 5, 1998, we granted IDOT leave to file an amicus brief urging reversal of the preliminary injunction.

On appeal, the Village argues that the trial court abused its discretion in granting the preliminary injunction.  Specifically, the Village contends that the plaintiffs failed to prove that they have no adequate remedy at law and that they are likely to succeed on the merits of the case.  The Village also argues that there is a substantial public interest in removing the Av Group from the airport premises, as the Village could potentially lose millions of dollars in federal and state funds.  Finally, the Village contends that the trial court erred in refusing to require the plaintiffs to post a bond.

In order to grant preliminary injunctive relief, the trial court must find that (1) the plaintiff has demonstrated a clearly ascertained right in need of protection; (2) irreparable injury will occur without the injunction; (3) no adequate remedy at law exists; and (4) there is a probability that the plaintiff will succeed on the merits of the case.  
Lindholm v. Holtz
, 221 Ill. App. 3d 330, 333 (1991).  It is not the purpose of a preliminary injunction to determine any controverted rights or to decide the merits of the case.  
Grillo v. Sidney Wanzer & Sons, Inc.
, 26 Ill. App. 3d 1007, 1011 (1975).  Rather, a preliminary injunction is granted prior to trial on the merits for the purpose of preventing a threatened wrong and to preserve the status quo with the least injury to the parties concerned.  
Bojangles, Inc. v. City of Elmhurst
, 39 Ill. App. 3d 19, 26 (1976).

The issuance of a preliminary injunction is within the sound discretion of the trial court upon a 
prima
 
facie
 demonstration that there is a fair question as to the existence of the right claimed and that the circumstances lead to a reasonable belief that the moving party will be entitled to the relief sought.  
City of Chicago v. Airline Canteen Services, Inc.
, 64 Ill. App. 3d 417, 432 (1978).  The reviewing court will not set aside the trial court’s determination unless there has been a manifest abuse of discretion.  
Russell v. Howe
, 293 Ill. App. 3d 293, 295 (1997).

Based upon our review of the record, we do not believe that there is a probability that the plaintiffs will succeed on the merits of their declaratory judgment action.  Rather, we believe that the evidence adduced at the hearing demonstrates that the plaintiffs have committed numerous violations of the operating agreement and that they have failed to operate the airport in compliance with the applicable laws and regulations.  Under the express terms of the operating agreement, the plaintiffs were obligated to operate the airport for the benefit of the public and in compliance with all applicable federal and state laws and regulations relating to airports.

For example, as an airport receiving state funding, the plaintiffs were required to keep the airport open to all types of aeronautical uses and were prohibited from discriminating against others desiring to operate out of the airport.  620 ILCS 5/34 (West 1996); see also 14 C.F.R. Pt. 152, App. D (18), (19), (20) (1996).  Indeed, state law specifically provides that "the public will not be deprived of its rightful, fair, equal and uniform use" of the airport.  620 ILCS 5/34 (West 1996); see also 49 U.S.C. § 40103(e) (1996).  The purpose of such provisions is to prohibit monopolies and combinations in restraint of trade or commerce and to promote and encourage competition in civil aeronautics.   See 
Niswonger v. Amercian Aviation, Inc.
, 411 F. Supp. 763, 766 (E.D. Tenn. 1975).

The evidence presented at the hearing demonstrates that the plaintiffs attempted to prevent other businesses from operating at the airport.  The Av Group imposed numerous "minimum requirements" to operate at the airport, including fees for an EPA storm water permit and $5 million in insurance coverage.  As noted by IDOT employee James Bildilli, many of these fees and insurance requirements were either improper or excessive.  Additionally, none of these requirements had been imposed upon the operations of Meisner Aircraft, Finefield Aviation, or Northern Illinois Flight Center.  The obvious result of these "requirements" was to delay and frustrate other businesses, such as Blue Skies and Valley Air, from competing at the airport.  Such conduct would appear to be discriminatory and violative of state and federal law.  See 
City of Pompano Beach v. Federal Aviation Administration
, 774 F.2d 1529, 1544 (11th Cir. 1985) (city improperly discriminated against potential airport operator by imposing unreasonable standards and lease requirements).

Additionally, as noted above, all of the hangar lease agreements executed by the Av Group contained provisions that prevented any business from conducting commercial operations within the hangars.  While the plaintiffs apparently waived this prohibition for their own businesses, they vigorously enforced the prohibition against Blue Skies and Motive Services.  On several occasions, the Av Group sent notices to these businesses warning them that they were operating in violation of this lease provision.  Indeed, the Av Group terminated both of these leases and commenced litigation against both Blue Skies and Motive Services to evict them from the premises.  Such conduct had a clear discriminatory effect and would appear to be an illegal attempt to gain exclusive control of the airport.  See 
Pompano Beach
, 774 F.2d at 1544; 
Niswonger v. American Aviation, Inc.
, 411 F. Supp. 769, 770-71 (E.D. Tenn. 1975).

The plaintiffs also appear to have violated state and federal regulations by refusing to sell fuel on the airport premises.  State aviation regulations specifically require that every airport must provide fuel and oil facilities.  92 Ill. Adm. Code § 14.675(c) (1996).  Additionally, federal regulations require the operation and maintenance of all facilities necessary to serve the aeronautical users of an airport and prohibit the interference with the use of such facilities.  14 C.F.R. Pt. 152, App. D(22) (1996).  During the hearing on the plaintiff’s motion, Seedorf acknowledged that he refused to sell fuel to Shay on several occasions.  According to Bildilli, such a practice was unsafe because it would force a pilot to fly an aircraft that was low on fuel.

The plaintiffs argue that they have not unreasonably prevented other businesses from operating at the airport.  In support of their contention, the plaintiffs contend that Blue Skies, Motive Services, and Valley Air all successfully commenced operations at the airport and continued operations throughout the time in question.  Such an argument is without merit.  That plaintiffs were ultimately unsuccessful in their attempts to prevent other businesses from operating at the airport does not negate their discriminatory and illegal conduct.

Rather, the plaintiffs’ failure to operate the airport in conformity with the applicable laws and regulations appears to be a clear breach of their operating agreement with the Village.  Under the terms of the operating agreement, the Village would therefore be permitted to terminate the operating agreement and reenter the premises.  Although we are mindful that the purpose of a preliminary injunction is to preserve the status quo between the parties and not to determine the ultimate factual issues, such relief is not warranted where there is no possibility of success on the merits.  See 
Ajax Engineering Corp. v. Sentry Insurance
, 143 Ill. App. 3d 81, 84 (1986).  Based on the record before us at the present time, the Av Group’s right to the permanent relief it seeks is doubtful.  We are therefore compelled to conclude that the trial court abused its discretion in entering the preliminary injunction.

We also believe that the entry of a preliminary injunction was improper in the instant case because the plaintiffs have an adequate remedy at law.  Illinois courts have consistently held that money damages are the appropriate remedy for breach of contract.  
Northrop Corp. v. AIL Systems, Inc.
, 218 Ill. App. 3d 951, 954-55 (1991).  In cases involving breach of contract, a monetary damage award is more complete, practical, and efficient than injunctive relief.  
Northrop Corp.
, 218 Ill. App. 3d at 955.

In the instant case, if an improper termination of the operating agreement occurred, the plaintiffs’ damages would be their lost profits for the duration of the agreement.  See 
Rivenbark v. Finis P. Ernest, Inc.
, 37 Ill. App. 3d 536, 538-39 (1976).  At the hearing, Seedorf testified that such profits are driven by the relatively "constant" monthly revenues received by the Av Group.  Such revenues are generated from monthly hangar and tie-down lease payments and consistently total $17,100.  Additionally, Seedorf acknowledged that the Av Group’s financial records specifically detail the monthly income received since the onset of the operating agreement.  We therefore believe that it would be a relatively simple task for the trial court to determine the plaintiffs’ damages in the event that an improper termination of the operating agreement should occur.

The plaintiffs argue that a monetary remedy would be speculative because of the difficulty in calculating future lost profits.  However, the plaintiffs fail to provide any convincing reason why its future profits may suddenly increase or decrease.  Although there certainly is the possibility of an increased demand for hangar space and use of the airport’s other facilities, such factors may be taken into account by the trial court in making a determination as to future lost profits.  See 
Kessler v. Continental Casualty Co.
, 132 Ill. App. 3d 540, 546 (1985) (lost profits can be measured on the basis of past performance and present predictions of future performance).

The plaintiffs also argue that a monetary remedy is inadequate because they will lose possession and use of the airport.  They argue the airport is a unique piece of real estate and that they will have difficulty finding another location where they could conduct their business.  However, the plaintiffs have failed to cite any authority for the proposition that the Av Group’s removal from the airport, in and of itself, would be a compensable loss.  Rather, as noted above, the plaintiffs’ sole basis for recovery would be its lost future profits.  See  
Northrop
, 218 Ill. App. 3d at 954-55.

Additionally, although it is possible that the Av Group may ultimately be required to cease operations at the airport, there is no question that Meisner Aircraft, Finefield Aviation, and Northern Illinois Flight Center will be able to continue their individual business operations.  These businesses have leases with the airport, and the Village has indicated that it has no intention of attempting to remove them from the premises.  We therefore believe it disingenuous for plaintiffs to argue that they will not be permitted to use the airport or operate their businesses there.

Finally, the plaintiffs assert that the operating agreement conveys a possessory interest in the airport premises and that they cannot be removed absent an action by the Village pursuant to the Forcible Entry and Detainer Act (the Act) (735 ILCS 5/9--101 
et
 
seq.
 (West 1996)).  See generally 
City of Chicago v. Airline Canteen Service, Inc.
, 64 Ill. App. 3d 417, 435 (1978).  We decline to consider the merits of this contention because it is not ripe for our determination.  The plaintiffs filed the instant declaratory judgment action before the date that the operating agreement was to be terminated and before the Village made any attempt to reenter the property.  As there has been no attempt to remove the Av Group from the premises, we decline the parties’ invitation to determine the nature of Av Group’s possessory interests under the operating agreement or the necessity to initiate proceedings under the Act. 

In closing, we note that our discussion herein is offered solely for the purposes of explaining our determination to reverse the preliminary injunction.  The discussion should not be taken as a resolution on the ultimate merits of the case.  Rather, that determination is to be made by the trial court on the basis of the evidence presented at trial.

For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed and the cause remanded.

Reversed and remanded.

THOMAS and RATHJE, JJ., concur.